PAUL WILLIAMS, Respondent, *v.* WILLIAM HAYS, Appellant.

1. NEGLIGENCE — LIABILITY OF MASTER FOR LOSS OF VESSEL — INSANITY AS A DEFENSE. Where, in an action to recover from the master and charterer for the loss of a vessel through his negligence, it is interposed as a defense that the loss occurred in a storm when the defendant was temporarily insane, the doctrine which holds an insane person responsible for what in a sane person would be called willful or negligent conduct does not apply to the defendant's personal conduct in case his incapacity to care for and navigate the vessel resulted solely from exhaustion caused by his efforts to save the vessel during the storm.

2. MASTER'S CONDITION RESULT OF EFFORTS TO SAVE VESSEL — QUALIFICATION OF APPLICATION OF RULE AS TO RESPONSIBILITY OF INSANE PERSON. Where there is evidence tending to show that the defendant's condition resulted from his efforts to save the vessel during the storm, such as evidence that he had been upon duty almost continuously for three days and nights, and for the last forty-eight hours had not been below deck, it is error to dispose of the case without regarding the qualification required by the evidence, of the application to the defendant of the rule that an insane person is held responsible for what in a sane person would be called willful or negligent conduct.

3. LIABILITY FOR NEGLIGENCE OF MATE AND CREW — QUESTION OF FACT. If the defendant is relievable from responsibility for his personal

negligence, because of exhaustion arising from his efforts to save the ship, the question whether he is still liable by reason of the carelessness of the mate and crew being attributable to him as the carelessness of his servants may not be disposed of as a question of law, where the evidence raises a question of fact as to whether the condition of the defendant was so apparent at the time as to charge the mate with negligence in not taking command.

*Williams* v. *Hays*, 2 App. Div. 183, reversed.

(Argued November 22, 1898; decided January 10, 1899.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered March 18, 1896, affirming a judgment in favor of the plaintiff entered upon a verdict directed by the court.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Henry W. Goodrich* for appellant. If defendant's condition was solely in consequence of his efforts to save the vessel during the storm, such disability would be a defense to the claim of the plaintiff in this action. (143 N. Y. 443.) There was no legal evidence that the master was sailing the vessel on shares. (*Hooper* v. *Beecher*, 4 N. Y. S. R. 473; *Robbins* v. *Codman*, 4 E. D. Smith, 325; *Paige* v. *Willet*, 38 N. Y. 31; *Van Dyke* v. *Maguire*, 57 N. Y. 429.) Neither the master nor the ship is liable for a wreck growing out of the sudden disability of the master. (*Hays* v. *P. Ins. Co.*, 25 J. & S. 199; 127 N. Y. 656; *Copeland* v. *M. Ins. Co.*, 2 Metc. 432.)

*Lawrence Kneeland* for respondent. If defendant caused the destruction of the vessel by what, in sane persons, would be called willful or negligent conduct, he is liable. (*Cross* v. *Andrews*, Cro. Eliz. 622.) The decision of this court on the former appeal decided every other question in the case. (Story on Agency, § 314.)

HAIGHT, J. This action was brought by the plaintiff, as assignee of the Phœnix Insurance Company, to recover the

amount of insurance paid by the company to Parsons and Loud under a policy of insurance issued to them as the owners of one-sixteenth of the brig "Emily T. Sheldon."

The brig had been wrecked on Peaked Hill bar on Cape Cod near Provincetown, Mass., and it is alleged that the loss occurred through the negligence of the defendant, who was the master and part owner of the brig, and who commanded her at the time of the loss.

The plaintiff claims the right to recover in this action upon the theory that the insurance company became subrogated to the rights of the owners, whom it had insured. The answer denied the allegations of the complaint that the loss was caused through the negligence, carelessness, misconduct and improper navigation of the defendant, and alleges that at the time of the wreck he was unconscious of his acts and irresponsible therefor, and was not in a condition to navigate the brig on account of sickness, etc. At the conclusion of the evidence the trial court directed a verdict in favor of the plaintiff, holding that the insanity of the defendant furnished no defense. The defendant's counsel objected to the direction of the verdict and asked to go to the jury upon the questions: "*First*, whether or not the defendant became insane solely in consequence of his efforts to save the vessel during the storm. *Second*, whether the defendant became insane solely in consequence of a sickness occasioned by his efforts to save the vessel during the storm and the quinine which was taken therefor. *Third*, whether the mate was so cognizant of the condition of the master, of the insanity or other incompetency of the master, as to require him to take the command of the vessel away from the master. *Fourth*, whether the mate exercised due judgment in regard to the condition of the master. *Fifth*, whether the defendant, in consequence of his efforts to save the vessel during the storm became mentally and physically incompetent to give the vessel any further care than he did." These requests were refused by the court and a verdict was directed, to which rulings the defendant's counsel duly excepted.

On Thursday, the 18th day of March, 1886, the brig "Emily T. Sheldon" left Boothbay, Maine, with a cargo of ice bound for Annapolis, Md. At the time of sailing the weather was fair and remained so for about sixteen hours, at which time a storm commenced with high winds and rain, with a light snow. At the time of the commencement of the storm the vessel was in George's channel, and the defendant tacked to work her about, trying to find his way out, until it became practically impossible to tell where he was. He headed her in what was supposed to be the direction of Cape Cod, but not being able to make the cape, she was hove to to ride out the gale. This was about 4 o'clock in the afternoon of the 20th, and she remained hove to until about that time in the afternoon of the 21st, and then the defendant stood her off for what was supposed to be Cape Cod. On Monday morning, the 22d, between 4 and 5 o'clock, Thatcher island lights were sighted by the defendant. The storm had then abated, but there was a heavy roll of the sea. The defendant then turned the vessel over to the mate, telling him to keep her by the wind until he made Cape Cod light. He then went below and laid down upon a lounge in his cabin, but before doing so, took fifteen grains of quinine. It appears that during the storm he had had but little rest; had not gone to his berth or undressed; had eaten but little, and that for the last forty-eight hours he had been constantly upon deck; that he was worn out, exhausted, felt sick, and feared he was to have an attack of malaria. At about 11 o'clock, the second mate, to whom the vessel had been turned over, called the mate, saying that the vessel did not act very well. The mate then went upon deck, and about half-past eleven the steward called the defendant. He was lying, dressed, upon the lounge. He did not get up at the first call, and subsequently the steward pulled him off from the lounge in order to arouse him. He then got up, but within a few minutes was again found lying upon the lounge, and the steward went to him again and finally succeeded in getting him up on the deck of the vessel. There is some little difference in the tes-

timony of the witnesses in reference to the order of events thereafter occurring. According to the recollection of some of the witnesses, the captain came on deck about half-past twelve, after the crew had been at dinner. After he came on deck, the tug "Storm King" came up on their weather quarter and said that the rudderpost of the brig was split, and asked the captain if he did not want a tow. He said that he did not; that he guessed "we are all right." The Storm King then went away, and about one o'clock another boat came up under the stern of the brig and offered a tow, but was refused by the captain. McDonald, who kept the log of the vessel, testified: "After the boats went away, the vessel began to go off and come to, and she would not mind her helm at all, and the sea was edging her into the beach all the time. Then I went over and looked over the stern, but I could see nothing; then I got into the bowline, that is a rope with a noose in it, being around my waist and I was let down over the stern, and I looked at the rudderpost and it was split, but I could not tell how badly. I went back on deck and said that the rudderpost was split, and the captain said he didn't think it was, and said 'I can't see it and you can't, I think.' Then I began to think there was something wrong with the captain, that he did not act as he used to ; still, I could not see anything wrong with his manner, except when he spoke to me about the vessel, and he then told me to square the yards to see if the vessel would go off again and we did, and she did go off, but she came right back again, and I lowered the main trysail down again and hove the helm up again, but she did not go off, she went sideways in on to the beach and struck," at about 2:30 o'clock.

Considerable evidence was taken with reference to the condition of the captain, all of which tends to show that he staggered about the vessel, making irresponsive answers to questions, appeared to be in a dazed condition, and to be either drunk or insane. After the brig struck, a life saving boat came alongside and offered to take him ashore, but he refused to go, and the crew of the life boat had to remain for several

hours before they finally succeeded in coaxing him to go with them. He was taken ashore, but, according to his testimony, remembers nothing that occurred until the next day. The brig became a total wreck.

This action was considered in this court on a former review (143 N. Y. 442), at which time the law of the case was settled, except upon two points. It was then held that the defendant, as charterer of the brig, was liable for losses which occurred through his want of care or skill in the navigation of the vessel; that he was required to exercise such care and skill as a reasonably careful and prudent owner would ordinarily give to his own vessel, and that an insane person is responsible for his torts the same as if sane. The opinion contains some comments of the judge, which have been understood as indicating an intention to do away with any distinction between misfeasance and nonfeasance, and to hold that lunatics and infants were just as liable for their failure to act as they were for their affirmative torts. But when the judge comes to sum up the result of his examination of the authorities, he concludes by stating the rule to be that, if the defendant " caused her destruction by what in sane persons would be called willful or negligent conduct, the law holds him responsible." The final conclusion reached by the judge we accept as the law of this case. Whether a lunatic or a person mentally incapacitated should be held responsible in all instances for his nonfeasance or failure to act we will not now stop to consider.

The judge, then, proceeds in his opinion to say : " If the defendant had become insane solely in consequence of his efforts to save the vessel during the storm, we would have had a different case to deal with. He was not responsible for the storm, and, while it was raging, his efforts to save the vessel were tireless and unceasing ; and if he thus became mentally and physically incompetent to give the vessel any further care, it might be claimed that his want of care ought not to be attributed to him as a fault. In reference to such a case we do not now express any opinion. * * * If it should be

found upon the new trial of this action that the defendant's
mental condition was produced wholly by his efforts to save
the vessel during the storm, and it should, therefore, be held
that no fault could be attributed to him on account of what
he personally did or omitted to do, then the question would
still remain whether the carelessness of his mate and crew,
who were his servants, could not be attributed to him, and his
liability be thus based upon their carelessness." We thus
have two questions presented for consideration, *first*, did the
defendant become mentally and physically incompetent to care
for and navigate the vessel solely in consequence of his efforts
to save the vessel during the storm, and, *second*, if he was
thus mentally and physically incapacitated, were his mate and
crew guilty of negligence in not taking the command of the
vessel and procuring a tow ?

Upon directing a verdict in favor of the plaintiff the trial
court said : " Assuming, as we must, for such purpose, that the
condition of the defendant was the result of exhaustion,
caused by his efforts to save the ship from the perils of the
storm and the heavy dose of quinine which he took as a
remedy, I fail to see how that presents any exception to the
principle laid down by the Court of Appeals that a person of
unsound mind is responsible for the consequences of acts
which in the case of a sane person would be negligent. In
other words, the standard by which he is to be judged is the
same as that which must be applied to the actions of a sane
person. It certainly seems to be a cruel doctrine, but as it is
apparently based upon the principle that, as between two
innocent persons, the loss must fall upon him who caused it
rather than upon the other, the best that can be said about it
is that it is a rule which serves the convenience of the public
to which individual rights must give way."

It will thus be observed that the case was disposed of below
upon the ground that the defendant was liable even though
assuming that his condition was the result of exhaustion
caused by his efforts to save the ship from the perils of the
storm, and the question as to whether the mate was guilty of

negligence was not considered. The Appellate Division has affirmed, following in its opinion, the reasoning of the trial judge.

We cannot give our assent to such a view of the law. To our minds it is carrying the law of negligence to a point which is unreasonable, and, prior to this case, unheard of, and is establishing a doctrine abhorent to all principles of equity and justice. In this case, as we have seen, the storm commenced on Friday, continued through Saturday and Sunday, and it was not until 5 o'clock Monday morning that the defendant was relieved from the care of his vessel. For three days and nights he had been upon duty almost continuously, and for the last forty-eight hours had not been below the deck. The man is not yet born in whom there is not a limit to his physical and mental endurance, and when that limit has been passed, he must yield to laws over which man has no control. When the case was here before, it was said that the defendant was bound to exercise such reasonable care and prudence as a careful and prudent man would ordinarily give to his own vessel. What careful and prudent man could do more than to care for his vessel until overcome by physical and mental exhaustion? To do more was impossible. And yet we are told that he must, or be responsible. Among the familiar legal maxims are the following: The law intends what is agreeable to reason; it does not suffer an absurdity. Impossibility is an excuse in law, and there is no obligation to perform impossible things. (Coke Litt. 78; 9 Coke, 22; Coke Litt. 29; 1 Pothier Obl. pt. 1, c. 1, s. 4, § 3.) Applying these maxims to the case under consideration, we think the fallacy of the reasoning below is apparent, and that it cannot and ought not to be sustained.

As to whether the mate should be chargeable with negligence, is a question, which has not, as yet, been determined. It is said that he did nothing to save the vessel. It appears that he was on deck obeying the orders of the captain. The circumstances surrounding him were peculiar. Possibly he might have put the captain in irons and taken the command

of the vessel, but mutiny at sea is criminal and heavily punished. In order to justify such action he must be satisfied of the derangement of his superior officer, and be able to command the assistance of the crew. Whether the condition of the captain was so apparent at the time as to charge the mate with negligence in not resorting to strong measures, we think, was a question of fact for the determination of the jury, and that it was not within the province of the court to dispose of it as a question of law.

The judgment should be reversed and a new trial granted, with costs to abide the event.

BARTLETT, J. (dissenting). I am of opinion there was no question for the jury in this case.

The learned counsel for the defendant asked to go to the jury on two questions: *First.* "Whether or not the defendant became insane solely in consequence of his effort to save the vessel during the storm."

It is true that Judge EARL, writing in this case for the court on the former appeal, stated that if the defendant had become insane solely in consequence of his efforts to save the vessel during the storm, we would have had a different case to deal with.

It is, however, undisputed that the record now before us is identical in all essential respects with the one then under examination, and it, therefore, follows that the determination of this court that the insanity of the defendant was no defense, is the law of this case, and was properly followed by the trial judge when he directed a verdict for the plaintiff.

*Second.* "Whether the defendant became insane solely in consequence of a sickness occasioned by his efforts to save the vessel during the storm, and the quinine which was taken therefor."

Judge EARL stated in his opinion upon the former appeal that if it were found upon a new trial that the defendant's mental condition was produced wholly by his efforts to save the vessel during the storm, and it should, therefore, be held

that no fault could be attributed to him on account of what he personally did, or omitted to do, then the question would still remain whether the carelessness of his mates and crew, who were his servants, could not be attributed to him, and his liability be thus based upon their failure to act.

There is no conflict of evidence on this latter point, and only a question of law is presented to this court on undisputed facts, whether the captain was not liable for this loss, not only on account of his insanity, but for the reason that the mates and crew, having full knowledge of the captain's mental incapacity, and that the rudder was useless, failed to intervene and save the vessel, but allowed her to drift with the dead swell upon the beach, with all sail set and no anchors out, in a light wind blowing off shore, in the middle of a pleasant afternoon, with two steam tugs lying by and offering a tow to a port nine miles distant. There was no request to go to the jury as to the conduct of the crew.

The liability of the captain for the acts of his mates and crew is well settled.

Story on Agency (§ 314) states : " The policy of the maritime law has, therefore, indissolubly connected his (the master's) personal responsibility with that of all the other persons on board, who are under his command and are subjected to his authority."

With the same record before us as on the former appeal, I am unable to understand why the decision of this court should not be followed (143 N. Y. 442).

I vote for affirmance.

All concur, with HAIGHT, J., for reversal, except BARTLETT, J., who reads for affirmance.

Judgment reversed, etc.