## THE JEAN BART.

(District Court, D. California, S. D. December 7, 1911.)

1. SHIPPING (§ 137*)—DAMAGE TO CARGO—LIABILITY OF VESSEL—HARTER ACT.

The due care required of a shipowner to render the vessel seaworthy at the beginning of a voyage, in order to entitle him to the benefit of the exemption from liability for injury to cargo under Harter Act Feb. 13, 1893, c. 105, § 3, 27 Stat. 445 (U. S. Comp. St. 1901, p. 2946), must have reference to the nature of the cargo and of the voyage, and must take into account the conditions in respect to weather and temperature reasonably to be anticipated on the voyage if the cargo is of a character to be affected thereby.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 492; Dec. Dig. § 137.*]

2. SHIPPING (§ 137*)—DAMAGE TO CARGO—LIABILITY OF VESSEL—HARTER ACT—"FAULT IN MANAGEMENT OF VESSEL"—"NEGLIGENCE, FAULT, OR FAILURE."

The negligent failure of the master of a vessel to make proper use of the ventilating apparatus during the course of a five months' voyage, by reason of which, and the presence in the cargo of a large quantity of coke, the wicker or straw coverings on a large number of wine bottles were sweated and ruined, was not a fault or error in the management of the vessel, within the meaning of Harter Act Feb. 13, 1893, c. 105, § 3, 27 Stat. 445 (U. S. Comp. St. 1901, p. 2946), but "negligence, fault, or failure in proper * * * care of * * * merchandise or property" within section 1, for which the owner of the vessel is liable.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 492; Dec. Dig. § 137.*

Statutory exemptions of shipowners from liability, see notes to Nord-Deutscher Lloyd v. President, etc., of Insurance Co. of North America, 49 C. C. A. 11; Ralli v. New York & T. S. S. Co., 83 C. C. A. 294.]

In Admiralty. Suit by the Italian-Swiss Colony, a corporation, against the French barque Jean Bart. Decree for libelant.

Andros & Hengstler, for libelant.
William Denman, for respondent.

DIETRICH, District Judge. On or about the 30th day of July, 1908, the firm of Alexander De Grote & Co., as agents, shipped on board the French barque "Jean Bart," then lying at the port of Antwerp in the Kingdom of Belgium, 308 crates of empty "Chianti" wine bottles to be conveyed to the port of San Francisco and there delivered to libelant. The bottles were of a distinctive type, each being covered with a wicker or straw covering, and because of their peculiar shape could not well be used for the purpose for which they were intended without such covering. It is not seriously controverted that they were in good condition when they were received on board the ship at Antwerp, or that when delivered at San Francisco many of them were worthless and others more or less damaged; the straw or wicker covering having in some cases wholly rotted away, and in others having become so discolored and otherwise injured as to render the bottles unfit for commercial use. By this suit libelant seeks compensation for the loss thus sustained. Concurring in the view that the

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

damage was the result of excessive moisture, the parties disagree as to the origin or cause thereof and the responsibility therefor. Libelant's theory that the straw coverings were saturated by the intrusion of sea water is rejected; sweat alone is thought to be accountable for the injury. Anticipating such a conclusion, the libelant charges the respondent with responsibility upon three separate grounds: (1) Because the Jean Bart was equipped with an inadequate ventilating system; (2) because cargo was improperly stowed; (3) because the captain and other officers in charge were grossly negligent in caring for the cargo, in that they failed to make use of the means of ventilation with which the vessel was supplied. The respondent challenges the correctness of each of these propositions in point of fact, and further contends that, under the provisions of the Harter Act, the third proposition, even if it were true, would entail upon the respondent no legal responsibility. The evidence, while not voluminous, is intricate and highly conflicting in its possible implications, and I shall therefore not attempt to review it in detail, being content in the main to state conclusions and to comment upon the general aspects of the case.

In making the voyage in question the Jean Bart sailed from Antwerp on August 7, 1908, and, going by way of Cape of Good Hope and Hobart, arrived at San Francisco on the 9th of January, 1909. The ship's officers testify that unusually rough weather was encountered and that upon the whole the voyage was a tempestuous one. Unfortunately, these officers, upon whom we must of necessity rely almost exclusively for an account of the voyage, stand greatly if not entirely discredited by reason of the fact that the master and the first mate at least have given false testimony. It is conceded on behalf of the respondent that the logbook was deliberately and flagrantly falsified by the mate, and I am unable to avoid the conclusion that, when the master testified that in taking on the cargo he was not aware that the bottles bore wicker coverings, he willfully perverted the truth. While it is highly probable that rough weather was encountered, upon the whole I am not inclined to give full credence to the claim, which is inherently improbable, and rests upon such tainted testimony, that a storm of unusual violence raged without interruption for approximately 60 days.

[1] In determining whether or not the claimant discharged in full the duty which it owed to the libelant in providing a seaworthy vessel and in caring for the cargo, the measure of that duty must be considered with reference to the conditions under which it was to be performed. Conduct reasonably prudent under one set of circumstances may be grossly negligent under another. A ship may be seaworthy for one kind of a cargo and not seaworthy for another, or may be fully equipped for one voyage and wholly unfit for another. The Southwark, 191 U. S. 1, 24 Sup. Ct. 1, 48 L. Ed. 65. A vessel might be fit for a voyage from Antwerp to England and substantially wanting in equipment for a voyage from Antwerp to San Francisco; so "due care" of a cargo of lumber would fall far short of the care required for a cargo of fresh fruit or dressed beef. The duty of the carrier is discharged only by the taking of precautions and the exer-

cise of care, reasonably adequate for the protection of the cargo against perils which are known to exist or which by the exercise of reasonable foresight may be anticipated. Presumably the carrier's charges for transportation bear some relation both to the nature of the goods transported and the perils necessarily incident to their transportation and safe delivery. There is no room here for the defense that the damage was due to a latent or unknown cause, for sweat is familiarly known to the shipping world as a pervasive and highly destructive agency. The necessity for guarding against it is generally recognized, and the master of the Jean Bart was bound to take knowledge of the danger. As already stated, he knew when he received the consignment of bottles that they were covered with material susceptible to injury from moisture. The master and the owner were further bound to take cognizance of the fact that the voyage about to be undertaken was, to use claimant's own language, "the longest commercial voyage of the modern world," in the course of which there are likely to be great and sudden changes of temperature, a condition highly conducive to sweating of hold and cargo. These known conditions imposed the duty to take precautions and to use care reasonably commensurate with the perils to be anticipated.

It might well be that for an ordinary voyage, in a ship liberally equipped with ventilating devices, no reasonable criticism could be made of the manner in which the cargo was stowed; but, keeping in view the actual conditions under which the voyage was to be made, can it be held that reasonable care was exercised? A large quantity of coke constituted a part of the cargo, and while it is not shown, at least not by direct proof, that it was wet when received, it is well known that coke, by reason of its capacity to absorb moisture under certain conditions and throw it off in the form of vapor under others, is a most effective and dangerous agency in producing sweat. Some of the cases containing the bottles were stowed in a compartment close to the coke, and none of the compartment walls were impervious to moisture; nor were the cases protected by a waterproof or other covering. The ventilators and hatches were left open most of the time for the first eight weeks of the voyage, so that if it be true, as declared by the claimant, "that in all sea voyages the close proximity to the water, with its saturation of the air with moisture both visible and invisible, in haze, mist, or fog, constantly exposes the interior of the ship and the cargo to the invasion of dampness," it is highly probable that during this period of open hatches and ventilators the coke became highly saturated, and when the hatches and ventilators were kept closed for long periods of time, as the vessel encountered changing temperatures the accumulated moisture was released in the form of vapor or sweat.

The ventilating equipment seems to have been very meager and not reasonably adequate for such a voyage. By the testimony of the naval expert produced as a witness on behalf of the claimant it is shown that the two small ventilators with which the vessel was fitted were liable to be inoperative at times even in good weather, and the hatches upon which much reliance is placed are not primarily intended for

ventilating purposes and are capable of being used only in good weather. True the equipment is similar to that of other French vessels of the same class and constructed in the same period, but it does not therefore necessarily follow that the equipment is reasonably adequate. While it is to be inferred from the expert's testimony that the ventilation of ships has not yet come to be an exact science, it appears that with certain limitations and qualifications efficient ventilating equipment is a mere matter of expense, and that for certain cargoes or certain voyages additional equipment is sometimes specially provided. It was the duty of the claimant to see that the Jean Bart was in respect to ventilation seaworthy for this particular voyage, and this duty it is thought was not fully discharged.

Little doubt can be entertained that the officers of the ship were negligent in making use of the means of ventilation at hand. If their testimony is to be credited, the ventilators were kept closed continuously for a period of approximately 60 days, and the hatches were condemned September 29th and not opened again until December 10th; they were also kept closed from January 2d until they were opened at San Francisco on January 9th. The great storm which was given as the reason for closing the hatches and ventilators apparently did not begin until November 9th, 40 days after the hatches were condemned, and if the logbook is to be credited much of that time the weather was clear. With ventilators and hatches all sealed continuously for such long periods of time, it is not strange that the wicker coverings of the bottles, saturated with the incarcerated moisture and unexposed to currents of fresh air, heated and decomposed. And in this connection it may be said that while the falsifications of the logbook by the mate, and the denial by the master that he knew of the wicker covering, may not be conclusive proof of negligence, the attempt of these officers to cover up the facts by perverting the truth at least signifies that in their judgment greater use should have been made of the means available for ventilating the cargo.

[2] It is contended, however, that under the provisions of the Harter Act (27 Stat. 445) the owner is not chargeable with such negligence of the officers of the ship. The contention rests upon a construction of section 3 of the act by which it is provided that, if the owner of any vessel "shall exercise due diligence to make said vessel in all respects seaworthy and properly manned, equipped and supplied, neither the vessel, her owner or owners, agent or charterers shall become or be held responsible for damage or loss resulting from faults or errors in navigation, or in the management of said vessel." Section 1 of the act, however, provides that it shall not be lawful for the master or owner of any vessel "to insert in any bill of lading or shipping document any clause, covenant or agreement whereby it, he or they shall be released from liability for loss or damage arising from negligence, fault, or failure in proper loading, stowage, custody, care or proper delivery of any" merchandise or property. The question therefore is whether the failure to properly use the ventilating equipment is a fault or error "in navigation or in the management of the ship," under the third section; or whether it is "negligence, fault, or

failure in proper * * * care of * * * merchandise or property committed" to the charge of the claimant. It sometimes happens that the duty of the ship's officers may relate both to the management of the ship and to the care of the cargo, and the rule has therefore become established that the proper classification in law of such a duty depends upon the purpose to which it primarily relates.

"I think that the first (clauses 1 and 2 of the act) presents exemptions in the case of direct want of care in respect of the cargo, and in the second (i. e., clause 3 of the act) the exemption is, though in a certain sense there may be want of care in respect of the cargo, primarily from liability for a fault arising in the navigation or the management of the vessel, and not of the cargo." Sir F. H. Jeune, in The Glenochil, 8 Aspinall's Maritime Cases, 219.

"But I think if those sections (i. e., of the act) are contrasted, there is a strong and marked contrast in the provisions which deal with the care of the cargo and those which deal with the management of the ship herself, and I think that where the act done in the management of the ship is one which is necessarily done in the proper handling of the vessel—though in the particular case the handling is not properly done, but is done for the safety of the ship herself and is not primarily done at all in connection with the cargo—that must be a matter which falls within the words, 'management of the said vessel.'" Barnes, J., in The Glenochil, Id.

"The fact that an act primarily having to do with cargo must incidentally affect the ship does not bring it within the class of acts done in the management of the ship. If the particular manner of performance adopted is not adopted with a view to its effect on the ship, but does affect the ship in a way that causes damage to cargo, the ship is not exempted from liability. * * * The controlling fact is that the effect on the ship is produced without intention and by accident. The negligence is in the manner of performing the act intended, to wit, the act having to do with the cargo. It is not in the management of the ship, because no act intended to affect the welfare of the ship is being performed." The Germanic, 124 Fed. 1, at page 6, 59 C. C. A. 521, at page 526.

I am of the opinion that here the failure of the officers primarily related to the care of the cargo, and only incidentally, if at all, to navigation or the management of the ship. While possibly this view is at variance with certain expressions to be found in Rowson v. Atlantic Transport Co., 9 Aspinall, Maritime Cases, 458, and in The Hudson (D. C.) 172 Fed. 1005, it is not inconsistent with anything said or decided in The Silvia, 171 U. S. 462, 19 Sup. Ct. 7, 43 L. Ed. 241, and upon principle finds support in Knott v. Botany Mills, 179 U. S. 69, 21 Sup. Ct. 30, 45 L. Ed. 90; The Germanic, 124 Fed. 1, 59 C. C. A. 521; s. c., 196 U. S. 589, 25 Sup. Ct. 317, 49 L. Ed. 610; Corsar v. Spreckels, 141 Fed. 264, 72 C. C. A. 378; and The Musselcreg (D. C.) 125 Fed. 786.

The general conclusion reached is that the libelant is entitled to recover the damages sustained, with interest and costs. Accordingly, the case will be referred for the purpose of ascertaining the amount of damages.