## THE SALUTATION.

(District Court, S. D. New York. June 19, 1916.)

TOWAGE ☞11(9)—LIABILITY FOR LOSS OF TOW—NEGLIGENCE OF TUG.

 The master of a tug, who, after lying in a harbor for 10 hours because the weather was threatening and he expected a storm, left and passed out into Long Island Sound with five boats in tow, without inquiring for the reports of the Weather Bureau, which had within a few hours sent out two storm warnings, or paying any attention to its signals, which he could have seen, and in the face of a very low and long falling barometer, *held* chargeable with negligence, which rendered the owner liable for the loss of four boats in the tow, which he was shortly afterward obliged to cut loose.

 [Ed. Note.—For other cases, see Towage, Cent. Dig. § 22; Dec. Dig. ☞11(9).]

In Admiralty. Suits by Cleary Bros. and by the Providence-Washington Insurance Company against the steam tug Salutation. Decrees for libelants.

Nelson Zabriskie, of New York City, for Cleary Bros.

James J. Macklin, of New York City, for Providence-Washington Ins. Co.

Herbert Green, of New York City, for the Salutation.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

HOUGH, District Judge. On the 1st of March, 1914, the Salutation encountered such a storm, shortly after passing eastward beyond Stratford entrance, Long Island Sound, that her master ordered all the men and women in a tow of five boats to gather on that boat which had the most freeboard, and cut loose the other four, which shortly foundered. One action is brought on behalf of the hull and cargo of the boat Quinn, and the other by the insurers of the cargo on the other three, which three belonged to interests practically identical with the claimants.

While it is alleged in respect of the Quinn that the weather was not so bad as to justify cutting her adrift, she being new and very seaworthy, the only point deemed necessary to consider is whether the Salutation was justified, under existing conditions of wind, weather, and warning, in leaving Bridgeport harbor at 12:30 p. m. March 1, 1914. The tug had come up from New York harbor with eight boats, three of them destined for Bridgeport. She arrived at Bridgeport before 3 o'clock on the morning of March 1st. She lay there until her departure at 12:30.

On the preceding day (February 28th) cautionary storm signals had been hoisted all along the coast, and particularly had the storm flag been put out on a flagstaff looking out over the Bridgeport harbor. This flag was flying when the Salutation came into Bridgeport harbor, and inquiry at the station of any official observer would have told an interested captain that the warning was against "shifting gales." Before 4 a. m. the master of the Salutation was on shore at Bridgeport and reported his whereabouts by telephone to the home office in New York. While he had come into Bridgeport primarily to deliver the boats consigned there, he remained in port for nearly 10 hours, waiting upon the weather, which he himself regarded as threatening until shortly before his departure. He did not observe the storm signal; he made no inquiry as to what the New York office might know about the weather, and has frankly testified (in substance) that he usually preferred his own weather wisdom to that of the government service.

At 10:38 a. m. of March 1st an additional storm warning was received by the New Haven observer, who immediately communicated the same by telephone to the office of the New Haven Towing Company, a concern identified in interest, if not identical, with the owners of the Salutation. It was thus possible for those who controlled the tug to know and send word to the master that there had been two storm warnings, varying somewhat in terms, sent out within 24 hours; but the land offices of the tug owners apparently entertained the same contempt for official warning as did Captain Kniffen. When from this kind of evidence one turns to the opinions of seafaring men, so far as revealed by the testimony herein, the usual contradiction is found; but this much is clear: Not only the master of the Salutation, but the captains of two other tugs which came into Bridgeport harbor just as the Salutation went out, thought that there was to be a storm; but, having regard to the direction of the wind, they believed it would

come from the west, and with a gale from that direction they regarded the tow of the Salutation as able to stand a storm astern, and therefore deemed it proper to go from Bridgeport to New Haven.

But the same reasoning did not apply to the tow of the other two tugs, i. e., the Resolute and the Keeler, because they had weaker and older boats than those in the Salutation's tow. Thus it stands admitted that a storm was expected, and only the direction thereof was wrongly guessed at.

But there is one other very old source of marine information which was consulted by the masters who have testified, viz. the barometer. The barometer had begun to fall on the 28th, and fell rapidly all the morning of March 1st. It is admitted that the glass had been going down to the knowledge of Captain Kniffen for nearly if not quite 18 hours before he left Bridgeport; and when he left it was very low, and by the time he returned minus his tow it had reached a depression almost unexampled in the history of the Weather Bureau. It is asserted that experience shows that barometrical depression frequently signifies nothing more than fog or rain, and does not always herald a storm. This is doubtless true; but it is common knowledge that the natural and normal result of the atmospheric disturbance which produces barometric depression is a violent agitation of the air, to wit, wind and storm.

It therefore stands confessed that the Salutation went out of Bridgeport harbor in intentional ignorance of anything and everything the Weather Bureau advised, in the expectation of a westerly storm, and in the face of a very low and long-falling barometer. The legal inquiry is whether such actions as this constitute reasonable prudence. In my opinion, even without the Weather Bureau warnings, the condition of the barometer and the acknowledged expectation of storm from the west were enough to render it proper to stay in port. But it was also negligence not even to inquire for the official weather reports. No man has a right to put his own opinion against the result of many years of experience. I entirely agree with the language of The E. V. McCaulley, 90 Fed. 511, 33 C. C. A. 620, and with the remarks of the court therein the language of Lacombe, J., in The Victoria, 95 Fed. 184, 37 C. C. A. 40, is entirely consistent.

The libelants may take decrees as prayed for, together with costs.