THE EDGAR H. VANCE. THE AGGI. NEHALEM S. S. CO. et al. v. AKTIESELSKABET AGGI et al.*

(Circuit Court of Appeals, Ninth Circuit. October 2, 1922.)

No. 3817.

1. Towage ⟾11(9)—Towing steamship leaving port in storm held liable for loss of tow.

The loss by stranding of a bark which started in tow from San Francisco to a Panama port *held* due solely to the fault and negligence of the towing steamship, in taking her tow from port into a storm which proved the worst known on the Pacific for 20 years, where her master, though advised by wireless, within an hour after leaving anchorage, the wind at the Farallones had increased to 65 miles an hour, and though he could have returned to port at any time within three hours thereafter, proceeded with the tow without further inquiry and in face of the increasing gale until the next day, when he was obliged, for safety of his own vessel, to abandon the tow.

2. Towage ⟾12(1)—Tow held not chargeable with fault contributing to her loss.

A tow *held* not chargeable with fault contributing to her loss, because of an error in her navigation after she had been abandoned at sea in a storm by the towing vessel, where, through the fault of such vessel, the master and pilot had been kept continuously on duty for many hours.

3. Shipping ⟾50—Charterer not liable for negligent navigation.

Negligence of a towing vessel, resulting in the loss of her tow, *held* not chargeable to her charterer, where the charter was not a demise.

.Appeal from the District Court of the United States for the First Division of the Northern District of California; Maurice T. Dooling, Judge.

Suit in admiralty by the Aktieselskabet Aggi, owner of the Norwegian bark Aggi, and others, against the Nehalem Steamship Company, owner of the steamship Edgar H. Vance, and others. Decree for libelants, and claimant and others appeal. Affirmed.

Ira A. Campbell, of New York City, and W. S. Burnett, Edward J. McCutchen, Farnham P. Griffiths, and McCutchen, Olney, Willard, Mannon & Greene, all of San Francisco, Cal., for appellants.

Andros & Hengstler, Louis T. Hengstler and F. W. Dorr, all of San Francisco, Cal., for appellee W. R. Grace & Co.

E. B. McClanahan, S. Hasket Derby, and William Denman, all of San Francisco, Cal., for other appellees.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. [1] As appears from the record, the real libelants in the court below (appellees here) are underwriters having written insurance on the Norwegian bark Aggi, then chartered to Geo. W. McNear, Inc., which was undertaken to be towed by the steamer Edgar H. Vance, belonging to the appellant steamship company, and which was then under charter to W. R. Grace & Co., from the port of San Francisco to Balboa, Isthmus of Panama, which voyage, very shortly after it was entered upon, resulted in the total loss of the Aggi and her cargo, consisting of grain and beans. That

---

⟾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied 260 U. S. —, 43 Sup. Ct. 250, 67 L. Ed. —.

the case as presented to this court is precisely that as presented to the court below appears from this brief opinion of that court:

"This is an important case, involving intricate questions of fact and of law. The testimony was all taken by deposition, and a voluminous record was presented to the court for consideration and study. Such consideration and study have been frequently interrupted, and even now I have not the time at my disposal in which to do other than announce my conclusions. These are:

"1. That it was negligence on the part of the master of the Edgar H. Vance to take the Aggi into the storm then raging, with the knowledge that he had of existing conditions, and without inquiry as to whether such conditions were improving or becoming worse. Upon this proposition I find much less difficulty than upon the one that follows, because of the unusual character of the latter.

"2. The loss of the Aggi is to be attributed to the original fault above mentioned, because the condition of the master of the Aggi and of the pilot on board was solely due thereto, and if they themselves were at fault in the navigation of the Aggi in the particulars claimed by respondents, at and prior to the time the vessel was stranded on Talcott Shoal, such fault was due to their condition of mental and physical exhaustion occasioned by their constant endeavors to save the vessel from the storm and its consequences, into which the negligence of the Vance had originally brought them.

"It follows from the foregoing that a decree should be entered fixing the responsibility of respondents, and referring the cause to the commissioner to ascertain and report the amount of the loss."

At the oral argument, which was elaborate and able, we thought, and still think, that the turning point in the case is whether, at the time the master of the Vance—Capt. R. B. Seike—started upon the voyage with the bark (whose captain was P. A. Olsen) in tow, he was, in view of the then condition of the weather guilty of such negligence as under the maritime law rendered his ship liable for the loss that subsequently occurred.

Before and at the time of starting each of the vessels had on board a licensed pilot; the Vance being equipped with wireless apparatus and having on board a wireless operator. Before boarding the respective vessels, which they did about 8 o'clock Thursday morning of April 29th, the pilots communicated with a station which the Merchants Exchange of San Francisco maintains at Point Lobos, and were informed that at 7 o'clock that morning the velocity of the wind at Point Reyes was 14 miles an hour. On boarding their respective vessels—Capt. Marshall going upon the Vance and Capt. Anderson upon the Aggi—each pilot reported to the master of his vessel the information he had received regarding the velocity of the wind at Point Reyes. At 41 minutes after 8 o'clock the wireless operator on the Vance intercepted a wireless message sent from the Farallone Islands to Mare Island, stating that at 8 o'clock that morning the wind there was from the northwest with a velocity of 65 miles an hour; the thermometer registering 29.75 degrees and the sea being choppy. Within 5 minutes the wireless operator delivered that message to Capt. Seike, who, notwithstanding, proceeded on her voyage with the Aggi in tow.

There is evidence to the effect that after 8 o'clock the wind increased so rapidly that before the start was made it was 85 miles an hour at Point Reyes, having increased 6 miles within one hour, and 3 miles within the next hour, and to 93 miles by 12 o'clock. It does not appear that Capt. Seike made any inquiry regarding the wind's velocity after receiving a copy of the intercepted message from the Faral-

lones, and he admits in his testimony that he could have returned the Aggi to the anchorage from which he took her at any time before passing a line drawn from Point Bonita to Point Lobos, which line he did not cross until 12:30.

The keeper of the government station at that point testified that at the hour last mentioned the wind was blowing from 75 to 85 miles an hour, and the records of the station show that it was the worst storm experienced there since the year 1902. Nevertheless into such a hurricane the master of the Vance proceeded with his tow. The record shows that in crossing the bar the Aggi's cargo shifted, causing a port list to the ship, and that throughout the afternoon and night of Thursday the wind blew with increasing force, reaching the velocity at its height of 110 miles an hour. It hardly needs to be said that the situation under such circumstances was full of danger and dread to all on board of the vessel that was being towed, resulting during the night of Thursday in the forward part of the Aggi being "all awash," necessitating the keeping of all of her crew aft, during which time three or four of its members were injured, one having been carried from the wheel over the poop and down to the main deck, and in her captain being thrown, while attempting to go forward to look after the hatches, against the rail with such force as to almost render him senseless.

During the same night the weather and sea were such as to cause a very heavy rolling of the Aggi, the washing of her decks, the smashing of her skylight over the cabin, through which and through the door leading to her companionway and into various of her rooms, water in large quantities entered, which the men had to bail constantly by means of short shifts, and during which time the port side of the ship, being from 5 to 6 feet under water, received a lot of lumber from the Vance which had dropped back abreast of the Aggi, being cast there by the waves. The weather continued so boisterous that the next (Friday) morning the master of the Vance, for the protection of his own ship and of those on board of her, cast the Aggi adrift to shift for herself. Assuming, as we do, that the conditions were such as to make that action imperative and justifiable, the fundamental question remains: What was the real cause of the loss in question?

It appears that Capt. Seike had his wife with him on board the Vance, and it is urged on behalf of the appellants that that fact affords strong evidence that the captain did not consider his course in entering upon the voyage under the circumstances that have been stated imprudent. Giving due weight to that suggestion, we think the true test of the question for decision is what good seamanship required of him. Even if it could be conceded that the master of the Vance was justified, in view of his actual knowledge and of his opportunities for further inquiry regarding the then existing weather conditions and their probabilities, in commencing the voyage, yet we are clearly of the opinion that he was grossly at fault in failing to return the tow to her anchorage while he confessedly had the ability to do so, instead of proceeding with the tow into and against a windstorm that had already attained the velocity of a hurricane.

Of course, negligence is not to be presumed, and we readily concede what was said by the Circuit Court of Appeals for the Second Circuit

in its recent decision (280 Fed. 711, 713), that has been called to our attention by appellants' proctors, to the effect that navigators are not to be charged with negligence unless their decision is one that nautical experience and good seamanship would condemn as unjustifiable at the time and under the circumstances. That is precisely the rule which forms the basis of our conclusion condemning as a gross fault the action of the master of the Vance here involved. See The Margaret, 94 U. S. 494, 24 L. Ed. 146; Gray's Harbor Tugboat Co. v. Peterson, 250 Fed. 956, 959, 163 C. C. A. 206; Transportation Line v. Hope, 95 U. S. 297, 24 L. Ed. 477; The Teaser, 246 Fed. 219, 158 C. C. A. 379; The Salutation (D. C.) 239 Fed. 421; Texas & Gulf S. S. Co. v. Parker (C. C. A.) 263 Fed. 864; The Bordentown, 40 Fed. 682, 685, 686, 28 Encyc. Law, 268.

[2] At the time on Friday morning that the Aggi was cast off by the Vance, what sails the former vessel had set had been torn to pieces, her braces so tangled as to be useless, some of her boats smashed, and all of them so damaged as to be useless, the seams of her deck had been materially opened, while the port rail was from 5 to 6 feet under water, caused by the shifting of her cargo while crossing the bar in entering the open sea under the conditions that have already been stated. The storm continuing, as the record shows without dispute, it is manifest that the Aggi was then wholly unseaworthy, and that it required every effort of her captain and crew to keep her afloat —the captain himself assisting in untangling the badly tangled braces, diving under the water to do so; it further appearing that he was not able to change his clothing from the beginning to the end of the disastrous voyage. There was, as clearly appears from the evidence, no rest for either officers or crew during the whole of Friday and Friday night, and no food was served to any one until Friday afternoon, which had to be prepared by the cook standing in water up to his waist.

Saturday the wind moderated to about 40 miles an hour, and Capt. Olsen, after consultation with Pilot Anderson (who had necessarily remained on board), determined to try to reach the port of San Pedro, where repairs might be made. That plan, however, had to be abandoned because of a change in the course of the wind, leaving as the only alternative an endeavor to get into the Santa Barbara Channel. That attempt, made by way of the Santa Cruz passage, was defeated on Monday by another change in the direction of the wind, leaving only two possible courses open to the distressed vessel—one to go around the westerly end of San Miguel Island and the other between that island and the island of Santa Rosa. The first of these alternatives was rejected, for the reason that it would subject the vessel to the danger of drifting further seaward and foundering, so at noon on Monday the San Miguel passage was undertaken, resulting in the Aggi being set by the currents on the shoal on which she was stranded. It is undisputed that the shoal itself was not visible, and that there was nothing on the surface of the water to indicate its existence, but on the chart which the captain of the Aggi at the time had and used, and which was introduced in evidence, there is a small circle of very small dots to mark the shoal, which, when Capt. Olsen, in his

testimony in this case, was shown the chart, he frankly stated that he could then plainly see the dots, but that he did not see them when attempting the passage under the circumstances that have been stated and in the condition in which he then was.

It was admitted by the proctor for the appellants, who examined the witness, that he was at the time in question "undoubtedly subjected to a great strain and trial of his strength," and we think that no one who reads the evidence with care can reasonably come to any other conclusion than that reached by the court below that:

"If the navigators of the Aggi were at fault in her navigation in the particulars claimed by the appellants at and prior to the time of her stranding, it was due to their condition of mental and physical exhaustion occasioned by their constant endeavors to save the vessel from the storm and its consequences into which the Vance had originally brought them."

See Williams v. Hays, 157 N. Y. 541, 52 N. E. 589, 43 L. R. A. 253, 63 Am. St. Rep. 797; The Steamer Webb, 14 Wall. 406, 417, 20 L. Ed. 774; The Mangolia, Fed. Cas. No. 8,958, cited with approval by the Circuit Court of Appeals of the Second Circuit in The City of Macon, 121 Fed. 686, 690, 58 C. C. A. 434; Marsden's Collisions at Sea (6th Ed.) 103, 104.

[3] Regarding the contention of the appellants as to the charterers of the Vance—W. R. Grace & Co., a corporation, brought into the case on motion of the respondents thereto, upon the claim that, if there was negligence on the part of the Vance, the charterers thereof were legally responsible therefor—we think it sufficient to cite in support of the negative of that proposition the decision of this court in the case of The Beaver, 219 Fed. 139, 136 C. C. A. 37, and the authorities there referred to; it being apparent, we think, from the terms of the charter party appearing in the record, that the instrument was not a demise of the vessel.

The decrees are affirmed.