### LORANG v. ALASKA S. S. CO.

(District Court, W. D. Washington, N. D. October 30, 1924.)

No. 8784.

**1. Seamen ⊜=29(5)—In action at law for injury, issues determined by common law.**

In an action by a seaman for an injury under Merchant Marine Act, § 33 (Comp. St. Ann. Supp. 1923, § 8337a), the issues must be determined according to the principles of the common law, and are the injury, the proximate cause thereof, and the measure of compensation, and allegations in the complaint of acts of negligence of defendant, unless such negligence was the proximate cause of the injury, are immaterial.

**2. Negligence ⊜=56(1)—"Proximate cause" of injury.**

"Proximate cause" is a continuous succession of events without an intermediate cause, so linked that they become a natural whole, unbroken by any new cause or undisturbed by any independent cause.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Proximate Cause.]

**3. Seamen ⊜=29(5)—Action at law for injury; relation to ship.**

In an action at law for injury under Merchant Marine Act, § 33 (Comp. St. Ann. Supp.

1923, § 8337a), the seaman bears a different relation to the ship than does the cargo, or a passenger, or a stranger, and his rights rest on a different basis.

At Law. Action by Walter E. Lorang against the Alaska Steamship Company. On motion to strike parts of complaint. Granted.

See, also, 298 F. 547.

The plaintiff sues under section 33 of the Merchant Marine Act (Comp. St. Ann. Supp. 1923, § 8337a), alleging that he is a citizen of this district and the defendant a citizen of the state of Nevada; that the defendant carries on a general steamship business for carriage of passengers and freight for hire from the port of Seattle to and between various ports in Alaska; that on the 10th day of October, 1922, he was in the employ of the defendant as an apprentice seaman on the steamship Juneau; that prior to departure from Cordova, Alaska, October 9, 1922, the defendant stored in the hold of the ship "a large and excessive cargo and tonnage of heavy copper ore, and more than said vessel was capable of safely carrying upon said voyage in said waters at that season of the year, and overloading said vessel until the load line thereof was within a few feet of the main deck of said vessel, and until said vessel was wholly unseaworthy, dangerous, and unfit to be taken upon or navigated in said waters on said voyage."

Paragraph VI of the complaint states in substance that the United States government at all times mentioned in the complaint kept and maintained a wireless station at Cordova, and a wireless station and lighthouse at Cape Hinchinbrook and at Cape St. Elias, adjacent to the route to be navigated by the vessel on the voyage, "from which stations and others the Weather Bureau gives the condition of the weather and sea and the approach of any storms along said route at frequent intervals to said station at Cordova," at which place, the plaintiff states, the defendant's officers could upon inquiry have ascertained the velocity of the wind, the condition of the sea, and the approach of any storms upon the course of the vessel; that the vessel, departing from Cordova and coming out from Prince William Sound into the Gulf of Alaska and the ocean, entered a storm with a wind of sufficient velocity and a sea running to such an extent as to make it unsafe, dangerous, and hazardous for said vessel to be navigated thereon in said unseaworthy condition; that the defendant's officers and agents made no inquiry as to the conditions of the weather

and sea; that on entering the Gulf of Alaska and encountering said storm the sea and waves broke over and upon the main deck, and at frequent intervals swept the same from stem to stern, and the vessel tossed, rolled, and pitched for more than 50 hours, during which time the plaintiff was injured.

In paragraph VII the plaintiff states in substance that the mess room, galley, and pantry of said vessel are built on the main deck, on the after part of the vessel, with a door leading therefrom out aft upon the main deck, and having another door from the outside on the starboard side about 50 feet forward on the main deck, and a passageway down into the engineroom and the storeroom; that the doors entering into the galley, pantry, and messroom on the after part were made of wood, were old, worn, cracked, and weak, and not sufficiently tight to prevent water from coming into the messroom through the seams and around the edges; that the plaintiff was on watch, working in the messroom, while the vessel was navigated in the storm, with heavy seas running and large waves breaking and washing the main deck, particularly the after part; that the plaintiff was ordered by the third officer to go out through the after door from the messroom upon the deck, "which was not provided with any lights, and was dark and unlighted," and to go into the storeroom and secure rags, and calk up the cracks and seams in the doors, and that he proceeded to obey, opened the after door to go out upon the main deck or after part of the ship, and as he opened the door a large sea broke and swept over that part of the deck, and struck the door and the plaintiff, wrenched the door from its hinges, and threw it against the plaintiff, and threw the plaintiff against the housing with great force, injuring, cutting, and bruising plaintiff's body, etc.

It is alleged, first, that the injury was caused by the unseaworthiness of the ship at the time it left the port of Seattle and at the time of the plaintiff's injury, which was known to the defendant; that the wooden doors were old, weak, and unfit for use, and not sufficiently strong and tight to withstand the seas, and prevent them from coming into the messroom through the cracks and seams, and smashing the after door in and from its hinges, and striking and injuring the plaintiff; second, that the vessel was unseaworthy when she departed from Cordova, in that she was negligently stored with a large cargo of copper ore in the hold to a greater amount that the vessel was capable of carrying, and caused the vessel "to

lie dangerously low in the water," and that the defendant "carelessly and negligently sent said vessel to sea in said dangerous, unsafe, and unseaworthy condition, and that by reason thereof said vessel took and shipped heavy seas, * * *" that the stern of the vessel would at intervals be completely submerged in the sea, and the vessel was rendered stiff and unwieldy, and caused her to roll deeply and excessively, and to take heavy seas, particularly in the after part, and that the plaintiff was negligently ordered and required to go upon deck while the storm was on and heavy seas running; third, that it was the duty of the defendant to provide lights in the after part of the ship, which it carelessly and negligently failed to do, and that by reason thereof "the plaintiff was unable to see and avoid the dangers to which he was exposed in going upon and working upon the said deck at the time at which the plaintiff was injured, * * * and * * * was unable to see and avoid any of the large waves and seas until they broke upon said deck; * * *" fourth, that the defendant was negligent in not making an inquiry from the Weather Bureau at the wireless station at Cordova about the condition of the weather along the course in which the vessel was to move; fifth, that the defendant ship was not seaworthy, in that it was constructed on the lines and style of a long scow, with a flat bottom, without sufficient taper and curving of the sides from the keel to the upper decks and to the bow and stern, so as to enable her to glide through the water and over the waves and swells and the roll of the ocean easily and readily.

The plaintiff alleges in substance that he was improperly cared for after the injury, by being placed on a wet mattress and not given medical attention for some days, and required several operations, endured great suffering, and that he is permanently injured, and in a second cause of action he realleges all of the paragraphs of the first cause of action, and then states that after receiving the injuries he was taken to the engineroom, his clothes being wet, and placed on a wet mattress, which caused him to take cold, and his injuries to become inflamed and diseased, and that he was compelled to remain 34 hours without receiving any treatment or care. He was then placed in the forecastle, where he was required to remain until the vessel reached Juneau, where he was placed in a hospital. He alleges that the vessel could have taken him direct to Juneau without great inconvenience, or sent him there at slight expense; that by reason of the treatment given his injuries became infected and inflamed, he became sick and weak, and that the broken bones could not be set on reaching the hospital, until given medical care and treatment, and that repeated operations will be necessary to afford relief; that he has not been cured of his injuries, which are permanent, and that he has suffered great pain.

The defendant moves to strike, among other things, all of paragraph VI of the first cause of action, from the beginning thereof to the word "that" on the 15th line of page 3 of the complaint, which reads as follows:

"That the United States government at all the times herein mentioned kept and maintained a wireless station at Cordova and a wireless station and light house at Cape Hinchinbrook and at Cape St. Elias, Alaska, adjacent to the route to be navigated by said vessel upon said return voyage, from which stations and others the Weather Bureau gives the condition of the weather and sea and the approach of any storms along said route at frequent intervals to said station at Cordova, at which place the officers of said vessel and the defendant and its agents upon inquiry can readily ascertain the velocity of the wind, the condition of the sea, and the approach or centering of any storms upon the course taken by said vessel upon said return voyage, and obtain the exact condition of the weather and sea in the Gulf of Alaska, through which waters the course of said vessel on said return voyage lay before departing from Cordova and before coming out from Prince William Sound into the Gulf of Alaska and Pacific Ocean."

And the following, beginning on line 23 of said article:

"Without making any inquiry as to the condition of the weather and the sea upon said course to be taken by said vessel."

And moves to strike the following in paragraph VII, beginning at line 26, page 4:

"Which was not provided with any lights and was dark and unlighted."

And subsection 2, article VII, beginning on line 6, page 3, as follows:

"And carelessly and negligently took on board and stored all of said cargo of copper ore in the hold thereof and a larger and greater amount of ore than said vessel was capable of carrying on said voyage."

And all of subsection 3, article VII, which reads as follows:

"Third. That it was the duty of the defendant and its said officers to have provid-

ed lights on the after part of said ship upon said deck where the plaintiff was required to go and work and was injured, as aforesaid, and that the defendant, its said officers and agents, carelessly and negligently failed and neglected to provide any lights upon the after part of said deck, as aforesaid, and that said steamship was further unseaworthy by reason of no lights having been provided on said deck on the after part of said ship, as aforesaid, and that by reason thereof the plaintiff was unable to see and avoid the dangers to which he was exposed in going upon and working upon the said deck at the time at which the plaintiff was injured, as aforesaid, or at all, and the plaintiff was unable to see and avoid any of the large waves and seas until they broke upon said deck of said vessel and struck and injured the plaintiff, as aforesaid."

And all of subsection 4, article VII, which reads:

"Fourth. That the defendant, its said officers and agents, failed and neglected to make any inquiry from the United States Weather Bureau at said wireless station at Cordova, Alaska, as to the condition of the sea and weather and the centering or approach of storms in the Gulf of Alaska, in which the course of the said vessel lay on said return voyage, prior to departing from Cordova and leaving Prince William Sound, and that it was the duty of the defendant, and its said officers, to make such inquiry and ascertain the condition of the sea and the weather and approach of storms upon said route which could have been readily and easily done at said wireless station and Weather Bureau at Cordova, Alaska, which posted and gave warnings of storms, and from which station the defendant and its said officers could have learned of the approach of said storm in the Gulf of Alaska, in which the course of said vessel lay on said return voyage, and could have easily and readily avoided running into the path of said storm and encountering the same."

And all of subsection 5, article VII, reading as follows:

"Fifth. That said steamship Juneau was further unseaworthy, in that said ship was constructed on the lines and style of a long scow with a flat bottom, and without sufficient tapering and curving of the sides thereof from the keel to the upper decks, and to the bow and stern thereof, so as to enable said vessel to cut, glide through the water, and over the waves, swells, and roll of the ocean easily and readily, and pre-vent said vessel from dipping, rolling, and taking the seas upon and over the upper decks thereof. That said vessel was faulty in construction, as aforesaid, and unseaworthy by reason thereof in the waters in which she was being navigated at the time plaintiff was injured as herein alleged."

Defendant further moves to strike the following from article VIII on page 8 of the complaint:

"That the plaintiff was injured internally, the extent of which injuries the plaintiff alleges he is unable to state."

Or in the alternative, in the event of the denial of such motion, that said allegation be made more definite and certain, and defendant moves to strike from article XI, page 11, line 3, of the complaint, the following:

"And for more than two years had studied to become a master mariner."

And from lines 9 and 10, article XI, supra, the following·

"And has been compelled to discontinue his studies to become a master mariner."

And from line 20 of said article:

"And has been rendered unable to pursue his said studies or to become a master mariner,"

—on the ground that all of said allegations are immaterial, irrelevant, and speculative, sham, and frivolous.

William Martin and Arthur E. Giffin, both of Seattle, Wash., for plaintiff.

Bogle & Bogle, of Seattle, Wash., for defendant.

NETERER, District Judge (after stating the facts as above). The motion to strike the parts of articles VI and VII specified in the motion is granted, and as to article VIII as set forth is denied. The motion as to the portions of article XI moved against is granted, the same being clearly frivolous and irrelevant. It is immaterial whether the defendant carelessly and negligently took on board the cargo of copper, or whether there were no lights as set forth in article VII, or whether the defendant made inquiry with relation to the condition of the weather.

[1] The plaintiff seeks to have his claim for injury measured by the common-law standard and to have a trial by jury instead of under the admiralty rule. (D. C.) 298 Fed. 547. He may determine what law he will rely on. The Fair v. Kohler Dye Co., 228 U. S. 22, 25, 33 S. Ct. 410, 57 L. Ed. 716; C. S. Ann. Supp. 1923, § 8337a. For injury he had two remedies—one in admi-

ralty, where the general seaworthy condition of the ship might be material as evidence of negligence and basis for recovery, and in such action the seaman is entitled to recover wages for the voyage and maintenance and cure, irrespective of negligence; or he may "at his election maintain an action for damages at law" (section 8337a, supra), and in such case the injury and the proximate cause thereof, and the measure of compensation, if any, is the issue, irrespective of the weather reports or construction of the ship, except in so far as such construction is the proximate cause of the injury. The plaintiff having elected to pursue his remedy at law, the issue must be determined according to the principles of the common law. The West Jester (D. C.) 281 Fed. 877; B. & O. Ry. Co. v Baugh, 149 U. S. 368, 13 S. Ct. 914, 37 L. Ed. 772.

[2] Proximate cause is a natural, continuous, sequence—a continuous succession of events without an intermediate cause, so linked that they become a natural whole, unbroken by any new cause, or undisturbed by an independent cause (Railway Co. v. Kellogg, 94 U. S. 469, 24 L. Ed. 256; Berns v. Gaston Gas Coal Co., 27 W. Va. 305, 55 Am. Rep. 304; Couse v. N. Y., L. E. & W. Ry., 49 Hun, 609, 2 N. Y. S. 312; Myers v. Chi., M. & St. P. Ry Co. [C. C.] 101 F. 915; Insurance Co. v. Boon, 95 U. S. 117, 130, 94 L. Ed. 395; Pease v. C. & N. W. Ry. Co., 61 Wis. 163, 20 N. W. 908), the cause that sets the other causes in operation.

[3] For the remedy invoked, the matters set forth in the complaint and sought to be stricken are irrelevant and immaterial. It is fundamental that a person may be negligent, but if the negligence is not the proximate cause of the injury there is no common-law liability. A seaman, in such action, bears a different relation to the ship than does the cargo, or passenger, or stranger, whose rights rest on a different basis. The Osceola, 189 U. S. 158, 23 S. Ct. 483, 47 L. Ed. 760; Chelentis v. Luckenbach S. S. Co., 247 U. S. 372, 38 S. Ct. 501, 62 L. Ed. 1171. The cases cited by the plaintiff, a summary of which appears in the margin,[1] have no relation to this issue.

---

[1] The Benjamin Noble, 244 Fed. 95, 156 C. C. A. 523, is a limitation of liability case.

In The Jean Bart, 197 F. 1003, it was held that improper ventilation of the ship was not excused by the Harter Act (Comp. St. §§ 8029–8035).

In The Manitoba (D. C.) 104 F. 145, failure to close the port on the approach of bad weather was negligence of the ship, even though the port was open at the beginning of the voy-

age and was not known to the officers of the ship.

Compagnie Maritime Francaise v. Meyer et al. (C. C. A.) 248 F. 881: To exempt from liability for damage to the cargo under the Harter Act it must be shown that the vessel was in all respects seaworthy and that due diligence was used to make her so.

The Oneida (D. C.) 108 F. 886: The Harter Act does not excuse for unseaworthiness, due to improper loading, making the ship topheavy and unstable, and thus unfit to encounter the ordinary perils of navigation, which should reasonably be anticipated during the voyage.

The R. P. Fitzgerald (C. C. A.) 212 F. 678: Under the Harter Act the owner must take such reasonable and adequate precautions for the protection of cargo as reasonable foresight may anticipate.

The C. W. Elphicke, 122 F. 439, 58 C. C. A. 421: A shipowner is not exempt under the Harter Act for damage to cargo resulting from unseaworthiness of the ship at the commencement of the voyage, even though he exercised due diligence to make her seaworthy in all respects.

In The E. V McCaulley, 90 F. 511, 33 C. C. A. 620, the court held a tug not negligent in putting to sea after a storm had abated and the signals had been changed to indicate fair weather and favorable winds, and that the insufficiency of the hawser to withstand a storm, where it appears the loss was not attributable thereto, was not negligence.

The Colima (D. C.) 82 F. 665: Judge Brown held a steamer not seaworthy that could not keep out of the trough of the sea during a storm, where she rolled heavily and in three successive large waves was turned over completely, she carrying on deck 47 tons of lumber, her beam being somewhat narrower in comparison with her depth than most steamers of her class, and held that insufficient heavy weights were loaded below, and that such neglect, combined with the tender model of the ship, with the deck load, through the shifting of the cargo when rolling heavily in the trough of the sea, constituted unseaworthiness.

The Salutation (D. C.) 239 F. 421: The weather was threatening, and the master expected a storm, had been lying in the harbor for 10 hours because of threatening weather, and passed out into Long Island Sound with five boats in tow, without inquiring for the reports of the Weather Bureau, which had within a few hours sent out two storm warnings, and paid no attention to its signals, which he should and could have seen, and a very low and long-falling barometer. He lost four boats and was held negligent.

Texas & Gulf S. S. Co. v. Parker (C. C. A.) 263 F. 864, a limitation of liability proceeding: It was shown that the master of the ship, which foundered going from Galveston to Corpus Christi, knew before leaving that a dangerous hurricane was entering the Gulf, and that it would reach the Texas coast before he could expect to reach Corpus Christi, and made no inquiry. It was held that when he knew, or might have upon inquiry ascertained, that a hurricane was approaching, he was negligent in putting to sea and attempting to outrun it with the type of vessel which he had, and limitation was denied. The owner knew of the master's decision to sail.

Judge Hough, in Nicholson v. Railway Co., 255 F. 55, 166 C. C. A. 382, held that failure to observe storm warnings or to obey them is not conclusive of negligence, but it is evidence of failure in that ordinary care and skill which is a master mariner's duty. In that case the masters said that they considered it no part of their duty either to observe or give weight to the Weather Bureau's advice. The judge said: "This was an error; we think such duty exists."