LIBBIE MOON, APPELLEE, V. ORDER OF UNITED COMMERCIAL TRAVELERS OF AMERICA, APPELLANT.

FILED APRIL 17, 1914.    No. 17,693.

1. **Insurance: ACTION FOR DEATH: SUFFICIENCY OF EVIDENCE.** The plaintiff, Libbie Moon, as the beneficiary of John W. Moon, in an action against the defendant, a fraternal accident association, alleged the death of her husband, John W. Moon, on February 16, 1911, through a bodily injury effected through external, violent and accidental means, and which alone occasioned his death. On said day, while going up the steps leading into his yard in the city of Omaha, the assured accidentally slipped and fell with force and violence, striking his external body near the region of the heart upon a large stone with such force as to cause a rupture of the left auricle of his heart, from which he immediately died. *Held,* That the petition states a cause of action which the evidence sustains, and that the death was caused by external, bodily injury, as contemplated by the indemnity clause in the certificate and the constitution of the association.

2. ———: ———: **PROXIMATE CAUSE.** The fact that the condition of the heart and other organs of the body of the assured may have the more readily permitted the rupture, it not having been shown that death would have ensued at the time it did but for the accident, the jury were warranted in finding that the accident was the proximate cause of the death.

3. ———: ———: ———. The fact that a person of 50 or 55 years of age would be likely to have a normal hardening of the arteries in parts of the body which might tend to bring about a rupture of the heart in case of a violent accident of the kind which occurred in the instant case is not sufficient to show that the accident was not the proximate cause of the death of the assured.

4. **Appeal: CONFLICTING EVIDENCE.** Where, in an action by the beneficiary against a fraternal accident association, there was evidence tending to show that the proximate cause of the death of the assured was a rupture of the left auricle of the heart, occasioned by his accidentally falling and striking his body on a large stone, although there was other and conflicting evidence as to the condition of the assured's health and the probable cause of his death, a verdict against the association will be sustained.

APPEAL from the district court for Douglas county; LEE S. ESTELLE, JUDGE. *Affirmed.*

96 Neb. 5

*Greene, Breckenridge, Gurley & Woodrough* and *Vorys, Sater, Seymour & Pease,* for appellant.

*A. W. Jefferis, contra.*

HAMER, J.

The defendant, a fraternal accident association insuring the lives of its members against death by accidental means and for accidental injuries, appeals from a judgment of the district court for Douglas county.

It appears that the defendant is a corporation organized under the laws of the state of Ohio, and it is authorized to do business in Nebraska, and that it conducts its business upon the mutual assessment plan. On or about April 12, 1907, John W. Moon, the decedent, became a member of the Order of United Commercial Travelers of America, and received his certificate of membership and insurance on his life. The plaintiff, Libbie Moon, is the widow of the said John W. Moon, and she is his beneficiary. John W. Moon died in Omaha, Nebraska, February 16, 1911. The plaintiff filed her petition in the district court for Douglas county May 9, 1911. On the 28th day of May, 1912, plaintiff recovered a judgment assessing her damages in the sum of $6,606.25.

Section 5, article VI of the constitution of the association, provides: "If any member of the order (other than a social member) who has paid, when due, all fees, fines, costs, dues and assessments charged or levied against him, shall sustain, during the continuance of his membership, and while in good standing, bodily injury effected through external, violent and accidental means, which, alone and independent of all other causes, shall occasion death immediately or within six months from the happening thereof, the Order of United Commercial Travelers of America, within ninety days of receipt of satisfactory proof of said accidental death, shall pay to the person or persons entitled thereto the sum of five thousand ($5,000) dollars, and shall also pay to the person or persons entitled thereto, as aforesaid, thirteen hundred ($1300) dollars in weekly

instalments of twenty-five ($25) dollars each, the first of such weekly instalments to be paid within ninety days from the receipt of such proof of death."

It is alleged in the petition that said Moon, up to and including the day of his death, paid all fees, fines, costs, dues and assessments charged against him by the defendant, and at the time of his death was an active member in good standing in the order and entitled to all rights and benefits under its constitution; that on February 16, 1911, said John W. Moon sustained a bodily injury effected through external, violent and accidental means, which injury, alone and independent of all other causes, occasioned his death; that said Moon on that day, while walking up the steps leading into his yard, accidentally slipped and fell with force and violence, and that his external body about and near the region of his heart struck upon a large stone with such force as to injure the left auricle of his heart, and also injured his body upon its external surface, and that the said injury so effected through said means, alone and independent of all other causes, occasioned the death of said Moon in about half an hour after he received said injury; that after the death of her husband plaintiff as his beneficiary performed all the conditions required of her by the defendant association, and permitted an autopsy to be held upon the remains of her said husband as demanded by the defendant, and furnished the defendant with notice and proofs of her husband's death in support of her claim under the certificate hereinbefore mentioned. The prayer was for judgment for $6,300, with interest at 7 per cent. from the 20th day of March, with costs of suit.

On the 12th of February, 1912, the defendant filed its amended answer, setting up that it is a corporation organized under the laws of the state of Ohio as a fraternal beneficiary association for the purpose of uniting fraternally all commercial travelers, and providing, among other things, for the establishment and maintenance of an indemnity fund for the protection of its members from accidental injuries and their beneficiaries against death re-

sulting from accidental means; that it admitted that said John W. Moon, on or about April 12, 1907, became a member of the order, and that the certificate set out in the petition was issued to him, and that he continued to be a member of the order in good and regular standing until the time of his death, and that all fees, fines, costs and dues charged against him as a member of the order were paid at the time of his death; that section 5 of article VI of the order was in the terms stated in the petition; that after the death of the said John W. Moon, and by and with the consent of the plaintiff, and in accordance with the provisions of section 9 of article VI of the constitution and by-laws of the order, an autopsy was held upon the body of the deceased, and that thereafter defendant denied any and all liability to plaintiff under and by reason of the terms of the contract existing between the order and the said John W. Moon at the time of his death, and refused and still refuses to pay to the plaintiff the sum of $6,300 or any part thereof; that said association denied all the allegations of the petition not expressly admitted to be true; that the defendant, for its second and separate defense, alleged, in addition to the provision hereinbefore quoted, that it was further provided in said section 5 of article VI of the constitution and by-laws of the order that "payments authorized under the provisions of this section shall not cover or extend to any death, disability, or loss resulting from or in consequence of fighting, duelling, over-exertion; * * * nor to any death, disability or loss resulting from or in consequence of bodily infirmity or deformity * * * mental infirmity, fainting spells, fits, epilepsy or vertigo; * * * nor to any death, disability or loss which results from or in consequence of the insured having been or being to any degree under the influence of intoxicating liquors, drugs or narcotics; * * * nor to any death, disability or loss of which there is no external or visible mark of the accident on the body (the dead body not being such a mark except in cases of drowning); nor to any death, disability or loss which results from or in consequence of any disease; nor to any death, disability

or loss caused wholly or in part by bodily infirmity or dis-
ease; nor to any death, disability or loss, unless caused
by bodily injury which is external, accidental, and is the
proximate, sole and only cause of the death, disability or
loss;" that said provision last quoted related to and was
a condition upon the provisions of that part of section
5 of article VI of the constitution and by-laws which was
accepted by the said Moon and became binding on him at
the time he became a member of the defendant order, and
is now binding upon the plaintiff and upon all persons
claiming under, through or by virtue of the membership
of the said John W. Moon in the defendant order; that the
alleged injury and disability claimed to have been sus-
tained by the said John W. Moon happened directly or in-
directly in consequence of a disease, and was caused solely
or in part by bodily infirmities or disease; and that the al-
leged injuries as claimed to have been sustained by the
said John W. Moon, if any such were received by him,
were not the proximate, sole and only cause of his death,
and that his death was not caused by any external, acci-
dental means.   A reply was filed to the second defense
March 12, 1912, denying each and every allegation therein
contained.

At the trial George Moon testified, on behalf of the
plaintiff, that he was 26 years of age and the son of the
plaintiff, and the deceased, John W. Moon; that on the
day of his death he met his father in a cigar store and pool
hall at 1904 Cuming street in Omaha, between 2 and 3
o'clock in the afternoon; that the father bought a cigar,
and together the father and the witness started for their
home at 1429 North Fourteenth street, which was about
four or five blocks north from the cigar store; that it was
rainy; that the sidewalks were slippery and the moisture
freezing; that the father was wearing a heavy ulster over-
coat and was smoking a cigar; that there were steps just
inside the gate; that these steps were about 8 inches high,
and about 13 or 14 inches wide, made of hard cement;
that a brick walk led from the steps up to the front porch
about 14 or 15 feet away; that there were two wooden

steps up to the porch proper, which was 6 feet wide; that
when the witness and his father reached the gate it was
closed, and the witness opened it, and the father stepped
into the yard first and they started up the steps together;
that when the father stepped on the first step his foot
slipped and he fell forward, sideways, and hit his side
against the top of the stairs, at or near the corner of the
step, striking his left side near the heart; that his hands
were in his overcoat pockets as they started up the steps;
that his father said he could not catch himself; that he
had an awful hard fall; that he could not protect himself
because he had his hands in his pockets; that the witness
assisted his father to arise and the father walked into the
house himself; that the steps were icy and slippery, the
same as the rest of the walks all around.   The witness
testified that his father was 5 feet and 8 inches high; that
he weighed 180 to 190 pounds; that after his fall he walked
up the porch steps and into the house and took off his
overcoat, his collar and necktie, and sat down in a chair;
that the witness took off his father's shoes, and the father
sat there a little bit, when the witness suggested that he
had better lie down, and if he did so he might feel bet-
ter, and that his father said, "I feel better now;" that his
father had his hand on his side and held it there until
after he got into the house and sat down; that he then
put his hand on the arm chair and leaned back and talked
to the witness and his mother, and after a few minutes
he went into the bedroom and laid down on the bed; that
the witness took his father's trousers off, and the father
showed him where he had hurt himself when he fell; that
he opened his shirt and exposed his side, which was swol-
len; that there was a red swollen spot about 3 or 4 inches
across, which looked like a bruise; that no one was pres-
ent at the time except the witness and his mother; that
the witness got some liniment and rubbed on his father's
side, and asked him if he wanted a doctor; that he re-
plied that he felt a little better, but in a few minutes his
mother called Dr. McCleneghan; that the mother also
helped rub the father's side with liniment; that about 15

minutes after he was called Dr. McCleneghan came; that at that time the father was either dead or was just dying.

The father traveled for a wholesale grocery firm in Council Bluffs, and the witness saw his father every Saturday and Sunday, and had so seen him for the five or six years that the father had been traveling for this grocery firm; that the witness did not notice any shortness of breath on the part of the father when he ran the washing machine that day, or at dinner; that his father was never at home sick at any time; that the father had a good complexion; that he seemed to breathe all right; that the witness never heard his father complain or make any complaint of pain about his heart or any other part of his body; that the father was 55 years old; that he had lost no time from sickness. The witness also described the father as being conscious up to within two or three minutes before his death. The witness also testified that his father appeared to be healthy, and that his color was healthy looking. It seems to have been only 25 or 30 minutes from the time when the deceased slipped and fell until he died.

Mrs. Jacob Voegeli saw the deceased and his son come home together; they were talking and laughing; she saw them turn in toward the house; she saw Moon as he fell on the steps, and noticed that he fell on his left side; she noticed his son take him by his arm after he got up.

Fred J. Stock described the color of the deceased as good. He never noticed any blueness in Moon's appearance or any shortness of breath. This witness described a spot on the left side of the upper part of the body. It was a pinkish spot two or three inches in diameter and in the region of the third or fourth rib from the bottom on the left side. The witness bathed the body and embalmed it. He saw the heart of the deceased and saw that the left auricle was ruptured. He squeezed the heart and blood would emerge from the rupture, and there was clotted blood in the auricle where the rupture was; the clot was perhaps the size of the ordinary hickory nut.

Dr. McCleneghan testified that he took up the subject of the autopsy with Dr. Fitzgibbon, one of the doctors

who represented the insurance company. The heart was removed from the body; also, the brain, liver, kidneys, stomach, lungs, and all the organs. He also testified that he examined Moon when he was alive; that there was no murmur in the heart; that the heart beats were regular, and the heart sounds normal, and his conclusion was that the heart was normal in size, and that the lungs were in order. He was at the autopsy. He described the wall of the auricle at the point where the rupture occurred as not very much thinner than normal, but he described the heart as hypertrophied and enlarged, although he was not certain of its diseased condition, and he was certain that the kidneys were diseased. He remembered that the doctors at the autopsy concluded that the diseased condition of the heart permitted its rupture. He did not appear to be fully satisfied with the sworn statement which he had signed along with the other doctors. He said it had been prepared before he signed it.

Mrs. Harriet Marty testified that she was a daughter of the deceased and the plaintiff; that her father had been a traveling man for 13 or 14 years for Groneweg & Schoentgen, and also for Raymond Brothers & Clarke of Lincoln, and Meyer & Raapke of Omaha; that during those years he had never been confined to his room on account of sickness; that she saw her father in the morning on the day he died, and that they took lunch together at noon that day, and that she saw him walk down the street with Don (a son); that at lunch they were talking and laughing together, and that her father made no complaint of any kind and looked the same as usual.

Don Moon testified that he saw his father on the day of his death. At lunch the father talked and laughed and enjoyed the meal, as they all did; that his father did not complain of fatigue or prostration or pain or anything of that kind; that he walked with his father from Nineteenth and Cuming streets, about four blocks from the home; that he looked and walked as usual.

Frank Read testified that he had known the deceased 7½ years, and during that time had seen him every Sat-

urday, and sometimes on Sunday; that the physical appearance of the deceased during that time was "a very healthy condition;" that the witness had noticed nothing out of the ordinary in Moon's appearance during his acquaintance with him; that he was a very active man; that prior to his death, for at least 6 weeks, the witness saw him daily; that they ate their dinner together, and that during that time his health seemed good in every way, and that he made no complaint about his heart or any other part of his body.

S. H. Nichols testified that he had known the deceased some 7 or 8 years. He saw him once a week on Saturdays when he came in, and occasionally on Sunday morning. The witness saw him often. He testified: "His appearance was that of a perfectly healthy man;" that he never heard him make any complaint; that he did not see any bluish appearance in his complexion.

Dr. Goetz testified that he had studied medicine in Cincinnati, Ohio, Vienna, and Berlin, and that he was then practicing in Omaha; that in the opinion of the witness the sole cause of the death of the deceased was the rupture of the heart, or some large blood vessel, or an aneurism—some hemorrhage.

R. F. Seitz, a traveling salesman, testified that he had been out on the road with the deceased covering his territory with him 3 or 4 times a year; that he was with him for 5 or 6 years; that these trips took about 2 weeks; that Moon traveled over the Missouri Pacific, Burlington, and Rock Island, and southwest of Council Bluffs in Nebraska; that he and the witness sometimes would make as high as 5 towns in a day; that their business required them to walk considerably; that the last time they traveled together was in November or December before Moon's death; that during the 5 or 6 years of their association the witness observed the ability of the deceased to move around and do business, and his personal appearance and physical condition; that he kept going and attending to business; that he did not make complaints to the witness: that he did not complain of any pain in his heart, back,

or kidneys, or in the region of the kidneys; that the witness did not hear him complain of any pains or sickness or ailments.

Mrs. Flood testified that she lived about four blocks from the Moon residence; that the day of his death it was a rainy and sleety day, and the sidewalks were slippery; that she had occasion to go out of doors that day, and saw Mr. Moon in the morning, and again at noon; that he was walking straight, smoking a cigar, and talking and laughing with his son; she saw him in the afternoon, and he and his son were walking as she saw them the first time; that she saw the face of the deceased, and that the face looked well to her, and that the deceased did not look sick, and that he was talking.

Miss Anna Tighe testified that she saw the deceased two nights before his death; that his complexion and color at that time were the same as at any other time when she had seen him; that he moved around as any one would; that she had never heard him complain of any pains or sickness.

The plaintiff testified that she had been married to the deceased 31 years, 14 years of which time they had lived in Omaha; that the deceased was a traveling salesman, giving the names of the firms for whom he had worked; that during their married life the deceased had never lost any time by reason of sickness; that about a month before his death he had a touch of grippe; that that was the only sickness she knew about; that it only lasted for a few days; that on the morning of the day of his death he ran the washing machine and wringer for the plaintiff, and took lunch at home with the family; that his complexion was the same as it always was; that she had never heard him make any complaint of fever; that his face did not appear feverish or blue; that he made no complaint of suffering pain on that day, or previously; that there were no eruptions on the skin or shortness of breath that day or prior thereto which the plaintiff noticed; that she saw him come in at the door on his return from down town after lunch on the day of his death; that he was holding his side and

said it hurt him very badly; that he then walked across the room and removed his overcoat, hat, collar and necktie; that he put them on the sideboard, and sat down in the chair about 10 feet from the door; that. he again complained that his side hurt him very badly from the fall; that he was holding his hand to his side, and the witness asked him if he would have a doctor and he refused, saying that perhaps he would soon be better; that the son, George, took his shoes off, and that the deceased walked to the bedroom and sat on the bed; that George removed his trousers; that his shirt was opened, and the witness placed her hand on his side, and he told her that was where he was hurt; that it was swollen over an area of about three inches in diameter; that she rubbed the side with some liniment; that he then said the doctor had better be called, that he was hurt badly; that his fall was worse than he thought, and that he was going to die; that he said, "My God, Libbie, I've got to die; I know I have; I can't stand the pain;" that Dr. McCleneghan came just as he died; that he died about 25 or 30 minutes from the time he entered the door.

Dr. Paul H. Ellis testified that he was a graduate from Creighton Medical College, Omaha; that for 6 or 7 years he had taught the practice of medicine in the Creighton Medical College; that he had been practicing medicine and surgery in Omaha for 15 years. In answer to a hypothetical question, claimed to cover the main facts in the case, the doctor testified, in substance, that the fall was the cause of his death.

It is in evidence that the right auricle of the heart was thin, probably in the neighborhood of one-twelfth of an inch; that the left auricle was a trifle thinner than the right; that with age the walls of the heart grow thinner, that they become so thin that the light will show through; that a diseased kidney will produce a gradual enlargement of the heart because it is an impediment in the circulation. It is also in evidence in this case that the kidneys were diseased; the disease seems to have been Bright's

disease, and it was said by witnesses that it was probably of long standing.

Dr. Fitzgibbon testified that he was present at the post mortem; that Dr. E. C. Henry and Dr. McCleneghan were there; that Dr. McCleneghan did the operating; that when the witness and Dr. Henry arrived the autopsy was already commenced by Dr. McCleneghan, who had begun to use the knife; that the heart, sections of the aorta (which distributes the blood), the kidney, sections of the liver and the spleen, sections of the femoral artery, and the brain were removed; that the femoral artery was found to be brittle, sclerosed, hard (unnaturally hard and unnaturally brittle, except as particularly applicable to the condition of the arteries in old men) ; that the body was noticeable for an unusual amount of fatty tissue; that the heart was enlarged; that the valves were diseased in the sense that they were shrunken and hardened; that the kidney examined was enlarged; that the spleen was enlarged; that the arteries were hardened; that the heart was about twice the normal size; that the walls were unusually thick in some places, and unusually thin in others; that there was a puncture or rupture of the left auricle; that the rupture was a tear one-half to three-fourths of an inch across; that the walls of the left auricle where the rupture occurred were translucent so that you could see the light shine through them; that the wall was from one-twelfth to one-fifteenth of an inch thick; that it was diseased and degenerated at the particular point of the rupture; that the condition was due to chronic disease; that the condition of the kidney was due to Bright's disease; that the rupture of the left auricle of the heart caused the death of the deceased; that the heart looked to the witness to be at least one and one-half times as large as a normal heart; that there were lacerations around the rupture extending from nothing to one-fourth of an inch, resembling somewhat the cracks in a broken window. This witness was acting as the surgeon of the defendant order.

Dr. W. O. Henry testified he had lived in Omaha 21 years; that he was a graduate of Bellevue College of New

York in 1879; that he took a postgraduate course in London; that he had taught orthopedic surgery and gynecology in Creighton Medical College, Omaha, for 10 years; that he measured the heart, and its circumference at the base was 11½ inches; that the circumference at the middle was 10½ inches; that it was 1½ times as large as the normal heart of a man 55 years of age and weighing 180 to 190 pounds; that the walls of the left ventricle were 1¼ inches thick; that the left auricle was dilated and ruptured, and that the walls of the left auricle were very thin; that the rupture in the left auricle was just above the junction of the auricle with the ventricle; that the edges of the wall at the point of rupture were as thin as a sheet of writing paper; that near the place of the rupture there was another very thin portion of the wall about half an inch in diameter; that the walls of the right auricle were also thin; that the aorta valves were sclerotic and unable to perform their duty in closing the orifice between the auricle and the ventricle; that the left auriclo-ventricular valve cusps were sclerotic; that the right cusps of the same kind were also sclerotic and incompetent; that the right auricle was dilated and the walls thin; that the right ventricle was dilated and the walls were thinner than normal; that the internal wall of the ascending portion of the aorta was roughened and sclerotic; that the aorta starts from the left ventricle, winds back over the top of the heart, and turns down posteriorly or behind the heart, distributing the blood of the entire body; that the kidney examined was affected by chronic Bright's disease, probably of long standing; that such a rupture as he found, however produced, would cause death; that rupture of the heart is produced by external or internal force; *that external force to the body may rupture a normal heart;* that it would not be possible for external violence to produce such a rupture in a normal heart as he found in the heart which he examined.

It was contended by the defendant that, if "death was occasioned by a bodily injury effected through external violence and accidental means alone, and independent of

all other causes, the plaintiff can recover and the judgment should be affirmed." But it is further contended that, if the death "was caused wholly or in part by bodily infirmity or disease, the plaintiff has no cause of action." It is contended that the autopsy showed that the deceased at the time of his death had interstitial nephritis, or Bright's disease, of long standing, and arterial sclerosis or hardening of the arteries well advanced, a chronic heart disease, which caused or contributed to cause a rupture of the heart, from which death resulted. It is in evidence that the thinning of the wall of the auricle was due to disease, and that the rupture was caused by increased pressure on the diseased heart; that the heart was diseased, being hypertrophied and enlarged; that the right auricle and the left ventricle were enlarged; that there were lacerations around the rupture. It is also in evidence that a sclerosed condition of the human body is a change which comes to *everybody with age;* a person of 50 or 55 years of age would have a *normal hardening* of the arteries in parts of the body. The evidence tends to show that the deceased was enjoying comparatively good health; that, if there was chronic disease of the heart and kidneys prior to the accident, there was no special reason to apprehend the immediate death of the assured; that at the time of the accident his foot slipped from the step, which was covered with ice and slippery; that the result was a severe fall, and the left side of the deceased, near the region of the heart, struck upon the edge of a stone step with great force, and the death was probably due to the accidental fall, which apparently caused the rupture of the left auricle of the heart.

There was a trial to the jury, and the physical condition of the deceased immediately prior to his death was necessarily one of the subjects of such investigation. The jury returned its verdict for the plaintiff, and the judgment of the district court was rendered upon it. Unless there was error in the conduct of the trial prejudicial to the defendant, we are not disposed to disturb the judgment, because it seems to be fully supported by the evidence.

It is seriously contended that the walls of the heart, the left and right auricles, were more or less thinned by the effect of advancing years, and it is argued that because of their condition the order should not be held liable. To this it may be said that, if the insurance is to be defeated because of the fact that the walls of the heart grow thinner by advancing age, or the arteries become sclerosed, or the valves of the heart act improperly, and this condition is the result of age, then the collection of insurance money may nearly always be defeated by the effect of increasing years which change the condition of the assured. We do not believe this to be the policy of the law. If it was the policy of the law it would permit the defeat of meritorious cases. It would, in effect, allow an association of this sort to conduct a business and to furnish salaries to those engaged in managing the affairs of the association, and it would give the members of such an association and their families nothing upon which there might be any reliance. It is contended by the defendant that the provisions of section 5 of article VI should not cover or extend to any death unless the injury which produces the death is external, accidental, and the proximate and only cause of the death. It is also contended by the defendant that the death was in consequence of disease, and that it was caused wholly or in part by bodily infirmity, and that the injury received was not the proximate, sole and only cause of the death. This would seem to bring us to the question whether the beneficiary of an elderly person who dies because of the injury received through an accident can recover anything if the organs of the body are affected by the age of the assured. When the membership is created it must be known that the member will grow old if he lives, and that the organs of his body, including the heart, lungs and kidneys, are likely to be affected in time, and that the assured will be unable to resist in his old age the force of an accident which he might have successfully resisted at an earlier period.

Dr. W. O. Henry, a witness for the defendant, testified that the rupture of the auricle would produce death, also

that it would not be possible for external violence to produce such a rupture in a normal heart as he found. The effect of this evidence, it is contended by the defendant, releases the company from liability, for the reason that it tends to show that the disease which thinned the wall of the auricle made the death possible, and in that way that such disease contributed to it, and that death was not "occasioned by a bodily injury effected through external violence and external means alone and independent of all other causes."

In *Caldwell v. Iowa State Traveling Men's Ass'n*, 156 Ia. 327, it was held: Where death results from erysipelas, which follows as a natural, though not as a necessary, consequence of an accidental wound upon the cheek, it may be deemed the proximate result of the wound, and not of the disease, within the requirements of an accident policy that death must result solely by accidental means. In the same case it was held: In an action on an accident insurance policy, evidence of the existence of a slight wound upon the cheek was sufficient to support a finding that the cause of the wound was violent and external. In the body of the opinion in that case it was said that the certificate provided for accident insurance only, and that the question at issue was whether the death of the assured was caused solely by external, violent, and accidental means. It is then related that the assured received a slight accidental injury on his left cheek, which caused a slight abrasion of the skin, and that it was this injury which resulted in the erysipelas. It is also said that it is undisputed that the immediate cause of the death of the assured was the erysipelas. It was contended by the defendant in that case that the evidence was wholly insufficient to sustain a finding that any accidental injury was in fact sustained by the assured, and there was a motion by the defendant for a directed verdict, which was denied. The court held that there was enough evidence to make a *prima facie* case and to go to the jury. It was said that the evidence was sufficient to sustain a finding that the

death of the assured was the proximate result of the wound or abrasion referred to.

In *Jenkins v. Hawkeye Commercial Men's Ass'n*, 147 Ia. 113, 30 L. R. A. n. s. 1181, the assured was 61 years of age. A fish bone lodged in the rectum, and, being removed therefrom by the deceased, caused an accidental wound, from which blood-poisoning ensued and death resulted. In that case *Carnes v. Iowa State Traveling Men's Ass'n*, 106 Ia. 281, 68 Am. St. Rep. 306, and *Miller v. Fidelity & Casualty Co.*, 97 Fed. 836, are cited with many other cases. In the *Jenkins* case it is said that the cases last above cited proceed on the theory that the design of the provision of the policy limiting it to "accidental operation of external means may be wholly internal." It is said that they proceed on the theory that the design of the provision is to guard the insurer against a liability upon a fraudulent claim of the insured for indemnity for bodily injuries "of which the only evidence might be the word of the person, and that, as the terms of the policy are to be construed most strongly against the insurer, the means coming from outside the body, though the injury be internal, should be regarded as external." The following authorities support the doctrine that death or injury from substances taken internally will be deemed to have been caused by *external* means: *Bayless v. Travelers Ins. Co.*, 14 Blatchf. 143, Fed. Cas., No. 1138 (taking larger dose of opium than prescribed) ; *Miller v. Fidelity & Casualty Co.*, 97 Fed. 836 (swallowing certain hard, pointed, and resistant substances of food) ; *Fidelity & Casualty Co. v. Lowenstein*, 97 Fed. 17, 46 L. R. A. 450 (unconsciously and unintentionally inhaling gas while asleep) ; *Healey v. Mutual Accident Ass'n*, 133 Ill. 556, 9 L. R. A. 371 (accidentally drinking poison) ; *Metropolitan Accident Ass'n v. Froiland*, 161 Ill. 30, 52 Am. St. Rep. 359 ; *Travelers Ins. Co. v. Dunlap*, 59 Ill. App. 515, affirmed in 160 Ill. 642 (taking carbolic acid) ; *Carnes v. Iowa State Traveling Men's Ass'n, supra*, (overdose of morphine) ; *American Accident Co. v. Reigart*, 94 Ky. 547, 21 L. R. A. 651 (food

passing into windpipe in attempt to swallow it) ; *Pickett v. Pacific Mutual Life Ins. Co.*, 144 Pa. St. 79, 13 L. R. A. 661 (inhalation of deadly gas in a well into which the assured descended).

In *French v. Fidelity & Casualty Co.*, 135 Wis. 259, the assured accidentally struck the lower part of his right leg on a small iron safe. Septic poisoning set in, and he died as a result of the injury. The policy had a clause in it "against bodily injuries sustained through external, violent, and accidental means." This clause stipulated that, "if death shall result from such injuries within 90 days, independently of all other causes, the company will pay the principal sum of $5,000." It was held that the blood-poisoning in this case, following a slight accidental abrasion of the skin, was within the provision "bodily injuries sustained through external, violent, and accidental means independently of all other causes." The company was held liable.

In *Delaney v. Modern Accident Club*, 121 Ia. 529, 63 L. R. A. 603, it was held that, where death caused by blood-poisoning received through a slight wound on the hand is the result of an accidental injury, it is within the meaning of an accident insurance policy, whether the poisoning was introduced into the wound by the instrument which inflicted it or from some other source.

For anything that appears in the evidence, the deceased might have lived many years but for the accident. We are of the opinion that the fall was the proximate cause of his death, and that the injury sustained is within the conditions of membership as set out in the certificate.

The judgment of the district court is right, and it is

AFFIRMED.

BARNES, ROSE and SEDGWICK, JJ., not sitting.