DUBUQUE FIRE AND MARINE INSUR-
ANCE COMPANY, Appellant,

v.

Clifford CAYLOR, Fayne Caylor and
Merle Caylor, doing business as Caylor
Brothers Construction Company, Ap-
pellees.

No. 5612.

United States Court of Appeals
Tenth Circuit.

Oct. 24, 1957.

Robert L. Jackson, Kansas City, Mo.
(Dean C. Allard and Donald C. Little,
Kansas City, Mo., were with him on the
brief), for appellant.

Clem W. Fairchild, Kansas City, Mo.,
and Karl V. Shawver, Jr., Paola, Kan.
(Davis, Thomson, Vandyke & Fairchild,
Kansas City, Mo., and Shawver & Shaw-
ver, Paola, Kan., were with them on the
brief), for appellees.

Before BRATTON, Chief Judge, and
PHILLIPS and BREITENSTEIN, Cir-
cuit Judges.

PHILLIPS, Circuit Judge.

Clifford Caylor, Fayne Caylor and
Merle Caylor, d/b/a Caylor Brothers
Construction Company,[1] brought an ac-
tion against the Dubuque Fire and Mar-
ine Insurance Company[2] in the Dis-
trict Court of Miami County, Kansas, on
an insurance policy issued by the Insur-
ance Company to the Caylor Brothers
seeking to recover under the policy losses
suffered by reason of damage to the en-
gines of three pieces of heavy construc-
tion equipment owned by them and cov-
ered under the policy.

The action was removed from the state
court to the United States District Court
for the District of Kansas on the ground
of diversity of citizenship. From a judg-
ment in favor of the Caylor Brothers for
$4,850 the Insurance Company has ap-
pealed.

On January 31, 1952, and February
1, 1952, the Caylor Brothers were the
owners of a number of pieces of heavy

---

1. Hereinafter called the Caylor Brothers.

2. Hereinafter called the Insurance Compa-
ny.

construction equipment, among which were two HD 19 tractors and a Super C LeTourneau Tournapoll 3T. Such heavy equipment was being used by the Caylor Brothers on a highway construction project near Hoxie, Kansas. On July 27, 1950, the Insurance Company issued to Caylor Brothers its Policy SP 17766, described as a "Scheduled Property Floater" to which was attached a "Contractor's Equipment Form" endorsement which, among other things, specifically described and listed, as property covered thereunder:

One Allis Chalmers HD 19 Tractor, Serial No. 931;

One Allis Chalmers HD Tractor, Serial No. 1468;

One Super C LeTourneau Tournapoll 3T, No. 5086CIH.

The endorsement attached to the policy, an interpretation of which presents the primary question in this appeal, in part provided:

"Contractors' Equipment Form
(All Risk)

" *    *    *    *    *    *

"This policy covers on the property described below or in schedule attached, to not exceeding the amount specified in respect of each of the machines described, against loss or damage thereto, directly caused by the risks and perils insured against.

" *    *    *    *    *    *

"This Policy Insures Against Direct Loss Or Damage Resulting From:

"Any external cause, except as hereinafter excluded.

"This Policy Does Not Insure Against:

"10.   Incidental loss or damage due to operation of equipment;

" *    *    *    *    *    *."

In the course of the Caylor Brothers' operation of its equipment on the highway project, it was customary to have the equipment assembled at the end of the day's work at some central location for servicing and maintenance. A pick-up truck was used in the servicing operation, on which was carried, among other things, permanent anti-freeze having an ethylene glycol base,[3] and crankcase and gear lubricating oil. Sometime prior to 4:30 p.m. on January 31, 1952, some one of the Caylor Brothers' employees, working in the dark, put an amount of the anti-freeze solution in the container used to pour lubricating oil into the engines of such equipment, which, sometime thereafter, but before the time of the damage, was poured into the crankcases of the engines of the three pieces of equipment above described.

Thereafter, on January 31, 1952, the HD 19 Tractor No. 1468, which had been used during the day in question, suffered an engine seizure and the following day the other tractor and the Tournapoll had similar occurrences. As a result of the anti-freeze solution being mingled with the crankcase oil already in the engines, a marked interference with normal lubrication of the pistons, connecting rods and other moving parts in the engines occurred, which caused the pistons and connecting rods to overheat and the engines to seize and lock. It is not disputed that the ethylene glycol in the anti-freeze solution was the agent causing such interference with the lubrication and the subsequent seizure of the pistons.

The total damages were stipulated to be $5,000, and under a deductible feature of the policy, the Insurance Company was entitled to deduct $50 per vehicle, or a total of $150.

The primary issue presented in this appeal is whether the damage to each engine was a "direct loss or damage from any external cause," within the meaning and terms of the policy endorsement, quoted supra.

As previously noted, the policy insured against "direct loss." The second paragraph of the policy provided that coverage thereunder extended to "loss or damage * * *, *directly caused* by the risks and perils insured against."

—————————

3.   Hereinafter called the anti-freeze solution.

(Italics ours.) The reasonable interpretation of the phrase "direct loss" is that it is synonymous in intendment with the phrase "directly caused" or "direct cause," so that the issue is whether the losses were caused, as stated by counsel for the Insurance Company in their brief, "directly from an external cause."

█ It is well settled that the words "direct cause," as used in insurance policies, ordinarily are synonymous in legal intendment with the words "proximate cause."[4] "Proximate cause" has many times been defined as that cause, which in natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the injury would not have occurred.[5]

█ The engine seizure and subsequent damage resulted from the presence of ethylene glycol in the anti-freeze solution. But for its presence in the engines the damage would not have occurred. The pouring of the anti-freeze solution in the engines was the efficient cause, unbroken by any efficient intervening cause, which, in a natural and continuous sequence, produced the damage.

Following the pouring of the anti-freeze solution into the crankcases of the engines, the use or operation of each engine was a normal, natural, probable and foreseeable event. Such use or operation was not an efficient intervening cause of the damage, but a mere contributing or concurring cause,[6] and the damage directly resulted from the pouring of the anti-freeze solution into the crankcases. Clearly, the operation of the engines without the presence of the anti-freeze solution in the crankcases would not have caused the damage. Hence, the pouring of the anti-freeze solution into the engines was the proximate cause of the damage and the direct cause of the loss within the meaning of the policy, or the direct loss within its terms and particular wording.

The trial court found that "sometime prior to the damage referred to [the anti-freeze solution] was poured in the crankcase of the three pieces of equipment." As previously noted, the insurance policy insured "Against Direct Loss Or Damage Resulting From: *Any external cause* * * *." (Italics ours.) It was admitted that the anti-freeze solution entered the crankcases in one of two ways: (1) through being poured in the oil intake from the outside of the engine; or (2) through internal leakage from the cooling system of the vehicles. In a consideration of the evidence adduced at the trial relevant to this question, we are of the opinion that the finding of the trial court to the effect that the solution was poured in from the outside is not clearly erroneous. One question remains: Was the pouring of the anti-freeze solution into the crankcases an external cause, within the terms and meaning of the policy? At the outset, it is important to note the distinction between external "cause" and external "damage." External damage refers to the condition of a particular part of a thing which has an inside and an outside, and, specifically, the outer or exterior part thereof.[7] External cause, on the

4. Dixie Pine Products Co. v. Maryland Casualty Co., 5 Cir., 133 F.2d 583, 585; Norwich Union Fire Ins. Soc. v. Board of Com'rs, 5 Cir., 141 F.2d 600; Gulf Portland Cement Co. v. Globe Indemnity Co., 5 Cir., 149 F.2d 196, 198.

5. Rowell v. City of Wichita, 162 Kan. 294, 176 P.2d 590; Milwaukee & St. P. Railway Co. v. Kellogg, 94 U.S. 469, 24 L.Ed. 256; Lorang v. Alaska S.S. Co., D.C. W.D.Wash., 2 F.2d 300; 25 C.J.S. Damages § 19, pp. 474–475.

6. Brown v. New York Cent. R. Co., D.C. E.D.Mich., 53 F.2d 490, 491, affirmed 63 F.2d 657, certiorari denied 290 U.S. 634, 54 S.Ct. 52, 78 L.Ed. 551; Conowingo Power Co. v. State of Maryland, 4 Cir., 120 F.2d 870, 875; 65 C.J.S. Negligence § 111.

7. 25 C.J. p. 229; 35 C.J.S. pp. 292–293; Webster's New International Dictionary, 2d Ed.

other hand, is concerned with the outward source or origin of an instigating agent.[8] A cause which has an external source or origin is not rendered internal by the fact that its effect is internal, since it is the means and not the injury itself to which the phrase refers.[9]

Thus, applying the facts in the instant case to the question, to wit: Were the losses proximately caused by an outward agent? it is clear, in our opinion, that such question must be answered affirmatively. Anti-freeze solution, containing ethylene glycol, was introduced into the engines from the outside and, by interfering with the normal lubrication of the engines, caused certain damages to result, all within the meaning of the insurance policy.

■ Prior to trial in this action, counsel for the Caylor Brothers served the Insurance Company with certain Interrogatories under Rule 33, Federal Rules of Civil Procedure, 28 U.S.C.A. Interrogatory No. 1 read as follows:

"State whether or not the defendant is denying liability under the policy, as set out in plaintiffs' petition, on the basis that the loss alleged comes under an exclusion of the policy."

The Insurance Company's answer to the above interrogatory was in the negative. This interrogatory was served for the purpose of narrowing the issues in the case and apparently did so. Under the well settled rule, issues not raised at the trial of the case may not be raised for the first time on appeal.[10]

Accordingly, we conclude that the decision of the lower court should be, and is, affirmed.

8. Miller v. Fidelity & Casualty Co., C.C. S.D.N.Y., 97 F. 836, 837; Jenkins v. Hawkeye Comm. Men's Ass'n, 147 Iowa 113, 124 N.W. 199, 30 L.R.A.,N.S., 1181.

9. Miller v. Fidelity & Casualty Co., C.C. S.D.N.Y., 97 F. 836, 837; Young v. Railway Mail Ass'n, 126 Mo.App. 325, 103 S.W. 557, 563; Moon v. Order of United Comm. Travelers, 96 Neb. 65, 146 N.W. 1037, 1043, 52 L.R.A.,N.S., 1203; 1 C.J. Accident Insurance § 78, p. 433; 45 C.J.S. Insurance § 754, p. 784.

10. Justheim Pet. Co. v. Hammond, 10 Cir., 227 F.2d 629, 633.