**METROPOLITAN LIFE INSURANCE COMPANY, Appellant,**

v.

**Eleanor E. MAIN, Appellee.**

**The TRAVELERS INSURANCE COMPANY, Appellant,**

v.

**Eleanor E. MAIN, Appellee.**

**Nos. 23326, 23328.**

United States Court of Appeals
Fifth Circuit.

Aug. 8, 1967.

Charles Cook Howell, Jr., Jacksonville, Fla., for appellant Metropolitan Life Ins. Co.

Francis P. Conroy, Harry T. Gray, Bruce S. Bullock, Jacksonville, Fla.,

Marks, Gray, Yates, Conroy & Gibbs, Jacksonville, Fla., of counsel, for appellant Travelers Ins. Co.

Robert C. Gobelman, Jacksonville, Fla., Mathews, Osborne & Ehrlich, Jacksonville, Fla., of counsel, for appellee.

Before PHILLIPS,* COLEMAN and SIMPSON, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge:

Robert C. Main was an insured under two group insurance policies covering employees of the General Electric Company. One policy was issued by the Metropolitan Life Insurance Company and one by The Travelers Insurance Company.[1] Metropolitan and Travelers each issued a certificate of insurance to Robert C. Main. Eleanor E. Main, his wife,[2] was named in each certificate as the beneficiary of the death benefits.

Main died on December 10, 1963, about 6 a. m. At the time of his death both policies were in effect and provided coverage for him for "bodily injury, * * * caused solely by accidental, violent and external means and, independently of all other causes, resulting in death * * *." Each policy provided that "Benefits are payable only if the death * * * is not caused or contributed to by disease, or bodily or mental infirmity or medical * * * treatment of such disease or infirmity, or by intentionally self-inflicted injury, * * *."

Mrs. Main brought an action against each of the insurers to recover as beneficiary the death benefits under its policy, alleging in her complaint in each case that "on or about December * * * 10, 1963, while said insurance contract was in full force and effect, * * * Main, sustained a bodily injury 'caused solely by accidental, violent and external means and, independently of all other causes, * * *' resulted" in his death.

The actions were consolidated for trial. Each of the insurers has appealed from a judgment on a jury verdict against it.

Main was employed by the General Electric Company at its Syracuse, New York plant from March 15, 1962, to August, 1962. From the time his employment ended at Syracuse to the date of his death, he was employed by the General Electric Company in its Apollo Support Department in Florida. His duties were to supervise all the buyers and subcontractors in the purchase of all materials and services used in such department. He had between 90 and 100 employees under his supervision, and on December 9, 1963, a new unit was added to the group of employees under his supervision, giving him a greater job responsibility. His duties were complex and rather technical. He was highly qualified to perform such duties, both by education and experience.

Main's family consisted of himself, his wife, four children, and one grandchild. They lived at Ormond Beach, Florida, during the time he was employed by General Electric in Florida. Shortly prior to December 9, 1963, he had made plans for a Christmas vacation in that year.

Prior to October 30, 1962, Main had used Medomin and Elixir of Butibel to relax him and aid him in going to sleep on retiring for the night, and he had used Equanil from time to time, when needed to relieve tension, acting under the direction of his then physician, who had given him prescriptions therefor. Medomin and Butibel are barbiturates. Equanil is a tranquilizer. On October 30, 1962, Main went to the office of Dr. C. M. Crouch at Daytona Beach, Florida. At that time, Dr. Crouch had been duly licensed to practice and had practiced medicine at Daytona Beach, Florida, for the preceding 15 years. Main showed Dr. Crouch prescriptions referred to above, explained his need for the drugs, and re-

---

* Of the Tenth Circuit, sitting by designation.

1. Hereinafter referred to respectively as Metropolitan and Travelers and collectively as the insurers.

2. Hereinafter referred to as Mrs. Main.

quested Dr. Crouch to give him prescriptions for such drugs. None of such drugs could be dispensed without a prescription. Dr. Crouch, after some discussion with Main, gave him a prescription for the Medomin and for Butibel, because he was of the opinion Main needed them to relax him and aid him in going to sleep at bedtime, and he gave Main a prescription for the Equanil, because he was of the opinion that at times Main needed Equanil "to allay his nervous system" as a tranquilizer, since on occasions he was under considerable pressure in the performance of his duties. Main's duties were such that at times they subjected him to considerable nervous strain.

Dr. Crouch testified unequivocally that from his conversations with and his observation and questioning of Main before he gave him the prescriptions, he was of the opinion that Main was not suffering from any bodily or mental disease or infirmity and that he did not prescribe such drugs or any other drug for any physical or mental disease or infirmity, and that Main did not suffer any permanent effect from taking the drugs he had prescribed, except from the drugs he took the night preceding his death.

Marjorie Sterling, who served as Main's secretary at the General Electric plant from October 15, 1962, through December 9, 1963, testified that during that period she saw and conversed with him daily during working hours and that his physical and mental health during the entire period was excellent; that the only time he lost from work was in December, 1962, when he was confined at his home for a short period because of a flu attack. She further testified that he had made plans for a Christmas vacation in 1963, and that when he left his work about 6 p. m. on December 9, 1963, he was in excellent spirits and was delighted because his superior had praised his work and added a new unit to the employees under his supervision, which increased his job responsibility.

During Main's employment by the General Electric Company in Florida, he received two complete physical examinations. The first one, on March 15, 1962, disclosed no significant findings. The second, on October 11, 1963, disclosed only overweight and tension. Tension is not a disease or bodily or mental infirmity. Main was six feet, two inches tall and weighed 218¼ pounds. He was advised by the company physician to reduce his weight down to 200 pounds and to have his blood pressure checked periodically. His blood pressure was within the normal range, he had no fever, and his pulse and respiration were normal when Dr. Crouch examined him in December, 1962. The company dispensary file of the General Electric Company pertaining to Main disclosed that he was not suffering from or with any disease or bodily or mental infirmity at any time from the commencement of his employment up to the time of his death.

Mrs. Main testified that the Mains enjoyed a happy family life and liked living in Florida; that Main enjoyed his work with General Electric; that she and he did things together, like playing golf, bridge, and bowling; that their relationship with their friends and neighbors was congenial; that Main's relationship with their children was harmonious and that he received much delight from his children and his association with them; that the Mains had no financial difficulties; that Main enjoyed excellent health and that his only illness while they lived in Florida was an attack of flu the night before Christmas in 1962; that on December 8, 1963, they arose early, played golf together in the forenoon, and in the afternoon they went to a tea and sang Christmas carols, and in the evening they had a small group of friends in for supper; that Main was perfectly normal when he left for work in the morning of December 9, 1963, and that when he returned that evening he was thrilled and happy about the enlargement of the group under his supervision and his increased job responsibility. Mrs. Main further testified that Main returned from work about 6:30 p. m. on December 9, 1963; that when he came in, first, as was his custom, he wound their cuckoo clock; that

while she was preparing the dinner he sat on a stool and told her "what had been going on all day"; that Main had two drinks of bourbon whiskey before dinner and one or two after dinner; that when Main returned from work he would usually sit down and have a drink of whiskey and talk to her while she was finishing the preparation of dinner; and that once in a while he would take two drinks, "but that was not very often"; that he took the extra drinks on the evening of December 9, because he was elated over his "new job"; that after dinner they discussed their plans for the coming Christmas vacation; that Main and the children retired about 9:30 or 10 p. m. and she went to their Florida Room and worked on some Christmas tree ornaments for their nieces and nephews; that she prepared to retire about 11:30 p. m.; that when she endeavored to sleep in their bedroom, Main was snoring so loudly that she could not go to sleep, so she returned to the Florida Room and laid down on a couch; that she returned to their bedroom two or three times, because she was not sleeping well on the couch, but that each time Main was still snoring so loudly that she could not go to sleep in the bedroom; that she last heard Main snoring between 2:30 and 3 a. m., December 10, 1963; that from then until she arose on the morning of December 10, 1963, she slept on the couch in the Florida Room; that after she arose on the morning of December 10, 1963, and while she was engaged in preparing their children's breakfast and getting them ready for school, she realized at about 7:30 a. m. that she had not heard the shower running in the bathroom and went to the bedroom to see "why my husband wasn't awake" and found him in bed and was unable to awaken him; that she then called Dr. Crouch, their family physician, and an ambulance; that she then went to the bathroom and observed the pants to Main's pajamas on the bathroom floor; and that they were not there when she disrobed in the bathroom about 11:30 p. m. on December 9, 1963.

Main's immediate supervisor testified that on working days he saw Main every two or three days and talked with him by telephone daily; that he also knew Main socially; that at social affairs he noted that Main would take one or two cocktails, but that he never saw him drink excessively. He further testified that Main worked regularly and enjoyed good health.

Main usually took one 200 milligram Medomin tablet each night at bedtime.

Dr. Couch treated Main on December 24, 1962, for gastroenteritis, usually called 24 to 48 hour flu by laymen. He gave him a liter of glucose intravenously and an anti-diarrhea preparation. He saw him again on December 30, 1962, and found that he had about recovered from the intestinal attack, but that he was suffering from a temporary rash for which he prescribed an anti-inflammation preparation.

Those were the only times Dr. Crouch saw Main professionally between October 30, 1962, until December 10, 1963. Dr. Crouch testified it was his opinion, based on his observation during his professional contacts with Main, that his physical and mental health was good.

Dr. James P. Andrews performed an autopsy on the body of Main on December 10, 1963, commencing at about 9:30 a. m. Dr. Andrews was well qualified, both by training and experience, to perform autopsies. He had performed about 200 autopsies a year for the previous five years. Dr. Andrews, during his five years of residency, three years at the Duke Hospital in Durham, North Carolina, and two years at the Cleveland Clinic Hospital in Cleveland, Ohio, had specialized in pathology, and he was highly experienced in the field of pathology. Pathology has to do with the laboratory side of the practice of medicine, and involves mainly diagnostic procedures. Pathologists examine tissue for evidence of disease, including tissues removed in surgical operations, biopsies, and autopsies.

Dr. Andrews made a thorough and complete autopsy on the body of Main. He

examined the body cavities for abnormal accumulations of fluid and checked to be sure that the lungs were not filled with air. He examined all of the vital organs, including the abdominal organs and major blood vessels. He examined the heart, liver, gall bladder, pancreas, spleen, both kidneys, bladder, prostate, adrenal glands, stomach, esophagus, small intestine and large intestine. He examined the body to determine whether there were any lymph nodes. He checked the thyroid gland. He examined the brain and took samples of the blood, the spinal fluid, and the urine. Chemical tests were made of the blood, the spinal fluid, and urine. He made a thorough and complete examination of all of Main's vital organs for every possible cause of death. He took blocks of tissue from all the vital organs, subjected them to a preservative solution, mounted portions of the tissue taken from each of such blocks on microscopic slides, and stained and examined them under the microscope. The blocks of tissue were embedded in paraffin and they and the microscopic slides were preserved for further examination. He found no evidence of injury, infirmity, or disease in any of the organs.

Dr. Andrews found alcohol and Medomin in the blood, the cerebrospinal fluid, and in the urine. The alcohol in the blood was 67 miligrams per cent, in the spinal fluid 67 milligrams per cent, and in the urine 140 milligrams per cent. The Medomin in the blood was 4.5 milligrams per cent, in the spinal fluid 3.0 milligrams per cent, and in the urine 1.35 milligrams per cent.

The only barbiturate found by Dr. Andrews in Main's blood, spinal fluid, and urine was Medomin. The other two drugs which had been prescribed by Dr. Crouch were not present. Dr. Andrews testified that had such drugs been ingested by Main on December 9, 1963, he would have found evidence thereof in Main's blood stream, spinal fluid, and urine.

Both alcohol and barbiturates depress the brain center that controls breathing and also controls blood pressure and circulation. When either alcohol or a barbiturate is ingested by a person in sufficient quantity to depress such brain center to the point where the blood will not supply the body with its minimum requirement of oxygen, body tissue dies and death ensues.

When alcohol and a barbiturate are ingested by a person sufficiently close in point of time that both are present in the blood and cerebrospinal fluid at the same time, a synergism occurs. A synergism is the cooperative action of two discrete, or individually distinct agencies or substances, which results in a total effect greater than the sum of their two effects when taken independently.[3] It is referred to as synergistic action. In Main's case the result was a greater depressant effect from the alcohol than would have occurred had the Medomin been absent, and a greater depressant effect from the Medomin than would have occurred had the alcohol been absent.

The amount of alcohol ingested by Main was not alone sufficient to cause his death and the amount of the Medomin ingested by him was not alone sufficient to cause his death, nor would the total effect of the two, absent the synergistic effect of each on the other, have been sufficient to cause his death.

After such examinations and tests and the exclusion of all other causes of death, Dr. Andrews concluded and so testified that the amount of Medomin ingested by Main was not alone sufficient to cause his death, and the amount of alcohol ingested by Main was not alone sufficient to cause his death, and that the total effect of the two, absent the synergistic action of each on the other, would not have been sufficient to cause his death; but he concluded and so testified that it was the depressing effect on the brain center, which controls breathing, blood circulation, and blood pressure, of the alcohol and Medomin, each enhanced by the synergistic action which occurs when both

3. Webster's New International Dictionary, 2nd Edition.

are present at the same time in the blood stream and spinal fluid, that caused Main's death.

However, neither the alcohol nor the Medomin lost its individual characteristics in the blood stream and spinal fluid. There, the alcohol continued to be alcohol and the Medomin continued to be Medomin. Each was separately identifiable and measurable. They did not combine with each other, or with any other element or substance, to create or form a new substance or new matter. Death was caused by the depressing effect of the alcohol and the depressing effect of the barbiturate on the brain center taking place at the same time, enhanced by the synergistic effect of each on the other, and not from an effect caused by a new substance or matter resulting from the merger of the alcohol and barbiturate.

Dr. Edward N. Willey, a medical doctor and pathologist, testified as a witness for Mrs. Main. He was the Medical Examiner for Duval County, Florida, and had performed in excess of 1,500 autopsies. He was very well qualified by training and experience as a pathologist and in autopsy examinations.

Dr. Willey examined the tissue blocks taken from Main's organs in gross and the slides microscopically. He also made additional slides from each of such blocks and examined them with a microscope. He found no anatomical abnormalities. He testified that it could be determined from his examination whether disease was present; that he found the vital organs all normal, and that at the time of his death Main was not suffering from any bodily disease or infirmity.

Dr. Willey testified that by applying well established and accepted medical standards of minimum and maximum bodily action on Medomin in the blood and spinal fluid, to the amount of Medomin found in the blood and spinal fluid samples taken by Dr. Andrews from Main's body about 9 a. m. on December 10, 1963, he was able to determine the maximum and minimum amount of Medomin ingested by Main during the night of December 9, 1963. He testified that Main, during that period, had ingested four to eight Medomin tablets.

Dr. Willey further testified that assuming Main commenced drinking an alcoholic beverage about 6 p. m. on December 9, 1963, and continued to drink such beverage until about 10 p. m. on December 9, 1963, and drank none thereafter; that the autopsy disclosed that Main's death occurred about 6 a. m. on December 10, 1963, and that the alcohol in Main's blood when the autopsy was performed was 67 milligrams per cent, [4] by applying well established minimum and maximum rates at which alcohol will be metabolized and eliminated from the body, which are 12 and 20 milligrams per hour, he could determine the minimum and maximum milligrams per cent of alcohol in Main's blood at midnight of December 9, 1963; that the minimum amount was 139 milligrams per cent; that on the basis of a metabolic rate of 15 milligrams per hour and an intermediate between 12 and 20 milligrams per cent per hour, the amount of alcohol in Main's blood at midnight, December 9, 1963, would be 157 milligrams per cent. He further testified that the minimum amount of 139 milligrams per cent in Main's blood would confuse him, impair his judgment, affect his perception of time so he would not have a correct awareness of the amount of time that had elapsed since a prior event, and perhaps would make him not conscious of the significance of actions taken. He further testified that in his opinion it was the synergistic action of the Medomin and the alcohol present in the blood stream and spinal fluid at the same time that depressed the center of the brain controlling breathing, blood circulation, and blood pressure and caused a respiratory arrest and Main's death.

He stated that he was able to determine the facts to which he had testified with reasonable medical certainty. He further testified that eight Medomin tablets, alone, would not have been sufficient to

---

4. All of the assumed facts were established by the evidence.

have caused Main's death, and the amount of alcohol, taken alone, would not have been sufficient to cause his death, but that it was the enhanced effect of both, due to the synergistic action, that caused his death. Dr. Willey further testified that the synergistic effect of alcohol and drugs causes an injury of a chemical nature on that portion of the brain which controls respiration, and that such injury produces a respiratory arrest.

Main was not warned of the synergistic effect of alcohol and barbiturates, when ingested sufficiently close in point of time to be in the blood stream and spinal fluid and other organs of the body at the same time, by Dr. Crouch or by the pharmacist who filled his prescriptions, nor was there any such warning on the packages or containers in which the drugs were dispensed to Main by the pharmacist.

About 11:30 p. m. on December 9, 1963, Mrs. Main disrobed and put on her nightgown in the bathroom adjoining the master bedroom, in which Main was then sleeping. The next morning she observed Main's pajama pants on the bathroom floor. They were not there when she disrobed the night before. The autopsy disclosed that the lower portion of his colon was empty. Hence, Main, who retired about 9:30 p. m., December 9, 1963, must have gone to the bathroom at least once after 11:30 p. m., December 9, 1963. The Medomin tablets were kept in the bathroom. From the uncontroverted testimony that he usually took one Medomin tablet when he retired for the night and Dr. Willey's testimony that Main ingested four to eight Medomin tablets the night of December 9, 1963, and that the alcohol level in his blood at midnight on December 9, 1963, was 139 to 157 milligrams per cent and that each of such amounts of alcohol would impair Main's judgment, his memory, and awareness of the lapse of time, it is a reasonable inference that Main returned to the bathroom one or more times after he retired on December 9, 1963, and ingested at least three additional Medomin tablets, without being aware that he was taking at least four times the number of

Medomin tablets prescribed by Dr. Crouch and the number he usually took nightly.

Medomin, Equanil and Butibel are not narcotics. Medomin and Butibel are not habit-forming drugs. There was no evidence warranting a conclusion that Main had taken enough Equanil to become addicted thereto. He had not manifested any addiction symptoms.

I

## Metropolitan's Appeal

Metropolitan contends the court erred in denying its motion for a directed verdict at the close of all the evidence and its motion for judgment notwithstanding the verdict, for two reasons:

1. That Main's death resulted from a bodily injury caused solely by internal, as opposed to external, means; and

2. That Main's death was caused or contributed to by disease or bodily or mental infirmity or medical treatment of such disease or infirmity.

With respect to the second ground, we think it is sufficient to say that the evidence of Dr. Crouch, Dr. Andrews and Dr. Willey, together with the evidence of lay witnesses, clearly warranted a finding by the jury that Main, at the time the Medomin, Equanil and Butibel were prescribed for him by Dr. Crouch and at all times thereafter, up to and including the time of his death, was not suffering from disease or bodily or mental infirmity and was enjoying good health; and that the Medomin, Equanil and Butibel were not prescribed for Main by Dr. Crouch, nor taken by Main for the treatment of any disease or bodily or mental infirmity.

■ Aside from a temporary illness at Christmastime in 1962, when Main suffered an attack of influenza, he enjoyed excellent health at all times here material. No doubt Main experienced some tension, but there was competent and credible medical evidence that tension, that is, intensity of feeling or effort, nervous anxiety, nervous strain, is not a disease or bodily or mental infirmity.

Dr. Crouch testified that tension, to a degree, is a normal condition in many persons; that it is desirable, in that one usually performs better under some tension, and that the tension under which Main at times worked was not a disease or a bodily or mental infirmity.

■ Was the means external? A cause which has an external source or origin is not rendered internal by the fact that its effect is internal. Hence, if the means which causes the death of an insured comes from outside his body, it is external, although it acts internally to cause such death.[5]

Strowmatt v. Volunteer State Life Insurance Co., Fla.App., 176 So.2d 563, and other cases relied on by Metropolitan, where death resulted from asphyxia, due to breathing in of vomitus from the pharynx into the trachea, thereby preventing breathing and shutting off the supply of fresh air into the lungs, in our opinion are clearly distinguishable from the instant case.

In *Strowmatt*, the Florida court recognized that where an insured chokes on food in an attempt to swallow it and the supply of breathable air to the lungs is thereby stopped and death results, the means is external. It distinguished those cases by pointing out that the vomitus from the stomach which clogs the trachea and shuts off the breathing in of fresh air to the lungs is not food which the insured has theretofore ingested, but a different substance. The court said: "It may have been food at one time, but having entered the stomach it is so changed that it can no longer be classified in that category" and for that reason it held the means, namely, the vomitus which caused the death, was not an external means, but of internal origin. Of course, when food enters the stomach, the stomach digestive process begins. Juices secreted by the stomach mix with the food and change it into a partially digested mass, something chemically different from the food itself when it entered the stomach.

Here, the alcohol, which cooperated with the Medomin tablets to create the synergistic effect and cause the depression in Main's brain center, remained alcohol after it entered his body. Until after Main's death, the alcohol in his body continued to be the same substance, identifiable and measurable as such, and remained a discrete agency and retained its distinct and individual characteristics. And the Medomin remained Medomin after it entered Main's body. Until after Main's death, the Medomin in his body continued to be the same substance, identifiable and measurable as such, and remained a discrete agency and retained its distinct and individual characteristics. True, the alcohol and the Medomin cooperated to produce a synergism, but it is a characteristic of alcohol, when present with Medomin, to cooperate with the latter to produce a synergistic effect, and it is a characteristic of Medomin, when present with alcohol, to cooperate with the latter to produce a synergistic effect, but those were not new characteristics that came about because of a change in either the alcohol or the Medomin. They were inherent characteristics of each.

5. Dubuque Fire and Marine Insurance Co. v. Caylor, 10 Cir., 249 F.2d 162, 165; Couch, George J., Cyclopedia of Insurance Law, 2nd Edition, § 41:40, pp. 66–67; Hawkeye-Security Insurance Company v. Iori Bros., Fla.App., 106 So. 2d 916, 917. The Florida court, in the last cited case, quoted with approval from Dubuque Fire and Marine Insurance Co. v. Caylor, supra, as follows:
   " '* * * At the outset, it is important to note the distinction between external "cause" and external "damage." External damage refers to the condition of a particular part of a thing which has an inside and an outside, and, specifically, the outer or exterior part thereof. * * * External cause, on the other hand, is concerned with the outward source or origin of an instigating agent. * * * A cause which has an external source or origin is not rendered internal by the fact that its effect is internal, since it is the means and not the injury itself to which the phrase (external means) refers. * * *' "

Hence, we conclude that the alcohol and the Medomin tablets constituted an external means, and that they caused a depression in Main's brain center, which controls breathing and blood circulation and pressure, through their synergistic effect, which resulted in damage to the cells and tissues of the body and caused Main's death. In other words, we hold the evidence established that the means was external, although the injury occurred within Main's body.

The judgment in the *Metropolitan* case is affirmed.

## II

### The Travelers Appeal

Counsel for Travelers contend that the construction of its policy is controlled by the law of Connecticut, and that under that law the means were not accidental, since Main intended to take the Medomin tablets and to take the whiskey imbibed by him.

We are of the opinion that under the law of Connecticut, as laid down in King v. Travelers Ins. Co., 123 Conn. 1, 192 A. 311; Culhane v. Aetna Life Ins. Co., 124 Conn. 237, 199 A. 103; and Huss v. Prudential Ins. Co. of America, D.C.D. Conn., 37 F.Supp. 364, there was ample evidence to warrant the jury in finding that the means in the instant case was accidental.

Dr. Crouch's direction, with respect to the Medomin tablets, was to take one on retiring at night. Main normally took one Medomin tablet when he retired at night. However, Main, after he had retired for the night at 9:30 p. m. on December 9, 1963, arose from his bed and went to the bathroom at least once and probably three times, and took at least three additional Medomin tablets. At the time he took such additional tablets, his judgment, his memory, and his awareness of the lapse of time were all impaired by the alcohol he had drunk on the evening of December 9, 1963. The

jury were fully warranted in finding that Main did not intend to take four times as many Medomin tablets as Dr. Crouch had prescribed and four times as many as he normally took; that he was not aware he was doing so or of the synergistic effect that would follow;[6] and that he did not intend to take Medomin tablets in an amount sufficient with the alcohol in his system to cause the injurious effects that ensued.

In the Connecticut case of King v. Travelers Ins. Co., supra, the injury suffered was ulceration upon the insured's forefingers. In its opinion, the Court said:

" * * * The jury might well have found that what caused the ulceration to appear upon his forefingers was exposure of these fingers to the X-ray a number of times, the cumulative effect of which was to cause the breaking down of the tissue and the appearance of the ulcers. The jury might also have found that there was no intention on the part of the insured in his use of the machine to expose himself to the X-ray to such a degree as to produce injurious consequences. * * "

We think the instant case comes within the rationale of the *King* case and warrants the conclusion that the means here involved were accidental. To hold otherwise would be to hold that Main intended to take sufficient alcohol and Medomin tablets to cause his death. Certainly, he had no reason to commit suicide, and there is nothing in the evidence to overcome the presumption that he did not intend so to do.

We adhere to what we said in the Metropolitan appeal; that under the evidence an issue of fact was presented for the determination of the jury as to whether Main's death was caused or contributed to by disease or mental or bodily infirmity, or medical treatment for such disease or infirmity, and that Travelers

---

6. The evidence fully warranted the jury in finding that Main had not been warned as to the synergistic effect of alcohol and Medomin when consumed at the same time or so nearly the same time that each is present in the body at the same time.

was not entitled to a directed verdict in its favor.

With respect to the instructions given by the court, we deem it sufficient to say that considered in the light of the evidence and the applicaable law, as hereinbefore stated, such instructions were correct and free from error.

The judgment in the *Travelers* case is affirmed.